FILED

2021 NOV -8 PM 1: 12

BARBARA A. WIEDENBEIN
CLERK OF COMMON PLEAS
CLERMONT COUNTY, OH

### IN THE COURT OF COMMON PLEAS
### CLERMONT COUNTY, OHIO

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No.: 2021 CVH 1035 |
| | : | |
| Plaintiff, | : | Judge: Haddad |
| | : | |
| v. | : | |
| | : | |
| Traffic Tech, Inc., et al. | : | **PLAINTIFF'S MOTION FOR A** |
| | : | **TEMPORARY RESTRAINING ORDER AND** |
| Defendants. | : | **PRELIMINARY INJUNCTION** |
| | : | |

Pursuant to Civil Rule 65, Plaintiff Total Quality Logistics, LLC ("TQL") moves the Court for a temporary restraining order and preliminary injunction prohibiting Nickolas J. Dugger ("Dugger"), a former TQL employee now employed by Defendant Traffic Tech, Inc. ("Traffic Tech"), a direct TQL competitor, from further violating the provisions of the Confidentiality and Restrictive Covenant (the "Agreement") that he signed in connection with his employment with TQL. TQL also moves the Court for a temporary restraining order and preliminary injunction prohibiting Traffic Tech from further tortiously and intentionally interfering with that contract.

Dugger knowingly violated the Agreement when he became employed by Traffic Tech. Indeed, he was specifically reminded of the Agreement and its non-compete and non-solicitation provisions. In his new position, which is the same or substantially the same as his position at TQL, Dugger has and will continue to disclose TQL's confidential and proprietary trade secret information to and for the benefit of Traffic Tech. Additionally, TQL has learned that Dugger has already improperly solicited at least one of TQL's customers—which happens to be the largest customer he serviced while at TQL.

1

Traffic Tech hired and continues to employ Dugger despite actual knowledge of the restrictive covenant. This is not the first time that Traffic Tech has been subject to a lawsuit for hiring a TQL employee still subject to a restrictive covenant. In 2016, TQL brought suit against a former employee and Traffic Tech, where the former employee had taken a position in violation of his restrictive covenant. Traffic Tech was made aware of TQL's non-compete agreement with its employees in that suit too. Despite informing Traffic Tech of Dugger's still-active restrictive covenant, Traffic Tech refuses to terminate Dugger's employment.

In the hyper-competitive transportation logistics industry, TQL relies heavily upon its relationships, tools, and training provided to its employees to succeed. TQL spent extensive time and resources developing its relationships, tools, and training, and its customer list and information, which is why, in part, TQL requires all of its employees to agree to and sign an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement. The Defendants' actions fly in the face of the governing contract and pose a serious threat to TQL's business.

Accordingly, TQL respectfully requests that this Court: (1) enjoin Dugger from any further violation of the Agreement by, *inter alia*, working as an agent or employee for or consulting with Traffic Tech, calling on or otherwise soliciting TQL's customers, and using, disclosing, or providing Traffic Tech's owners or employees with any of TQL's confidential or trade secret information; (2) enjoin Traffic Tech from further tortiously interfering with TQL's contractual relationship with Dugger; and (3) direct both Defendants to preserve all evidence in their possession, including text messages, emails, and other electronically stored information, until this Court can more fully hear this dispute in a preliminary injunction hearing, after TQL has had a sufficient opportunity to conduct discovery.

2

This Motion is based on TQL's Verified Complaint and the attached Memorandum in Support. Additionally, TQL is submitting a proposed Order for the Court's consideration.

Respectfully Submitted,

/s/ Matthew J. Wiles

Matthew J. Wiles (0075455)
Kelli J. Amador (0095550)
Dinsmore & Shohl LLP
191 W. Nationwide Blvd.
Suite 300
Columbus, Ohio 43215
Matthew.wiles@dinsmore.com
Kelli.amador@dinsmore.com
***Attorneys for Plaintiff Total Quality Logistics, LLC***

## MEMORANDUM OF LAW IN SUPPORT

### I. INTRODUCTION

Dugger is a former TQL employee who began employment with Traffic Tech, a direct TQL competitor, well before the one-year restrictive covenant in his contract with TQL had expired, and has already begun soliciting the customers he serviced while at TQL. These are clear and continuing breaches of the restrictive covenant Dugger agreed to during his employment with TQL.

The threat this poses to TQL's legitimate business interests cannot be overstated. Dugger, who had no prior experience in the logistics industry, received extensive training throughout his tenure at TQL, which provided him with TQL's blueprint for how to succeed in the industry. He was a primary point of contact with the TQL customers he serviced, and rose through the TQL ranks accessing a treasure trove of information concerning customers, carriers, prospects, and pricing histories and strategies all along the way. Permitting him to continue working for a direct competitor, untethered to his contract with TQL, and actively targeting TQL's customers, poses precisely the type of grave threat that a non-compete is specifically designed to prevent.

Accordingly, TQL respectfully requests that the Court issue an immediate injunction directing Dugger to comply with the terms of the contract he signed with TQL, including, specifically, the prohibitions against working for or associating in any way with a competitor and soliciting TQL's customers, and directing Traffic Tech, which has actual knowledge of his restrictive covenant, to refrain from further tortiously interfering with Dugger's contract.

### II. FACTUAL BACKGROUND

#### A. Nature of TQL's Business and the Logistics Industry

4

TQL is a national leader in the logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the continental United States. (Ver. Compl. ¶ 6.) TQL's customers consist of companies that want to ship goods from one location to another. (*Id.* ¶ 7.) These customers include companies that need to ship their own goods. (*Id.*) TQL's customers also include other freight brokers that have already agreed to ship goods on behalf of another customer, but need assistance in finding a carrier to fulfill the shipment. (*Id.*)

TQL does not own, operate, or lease any of its own trucks.. Nor does it employ any drivers to haul freight. (Ver. Compl. ¶ 8.) Rather, TQL engages and coordinates independent carriers that are able and willing to haul freight at the times and places required by TQL's customers. (*Id.*)

The third-party logistics industry (and the freight-shipping industry at large) is extremely competitive. (Ver. Compl. ¶ 9.) Among other things, relationships with customers, carriers, and other brokers are essential to sustained success within the industry. (*Id.*) TQL spends a great deal of time, money, and other resources developing relationships with new customers and strengthening relationships with existing ones. (*Id.*) Further, TQL has made substantial investments to develop and protect the secrecy of its proprietary systems, processes, and procedures it uses to manage its operations and to compete in this hyper-competitive industry. (*Id.*) Moreover, TQL protects its trade secrets and confidential information by conditioning employee access upon use of constantly changing passwords, and the implementation of internal controls that prevent employees from downloading or printing certain information. (*Id.* ¶ 10.)

**B.      Dugger's Employment With TQL**

Dugger worked at TQL from January 6, 2020 to September 24, 2021, holding the positions of Logistics Account Executive Trainee and Logistics Account Executive (Ver. Compl. ¶¶ 14.)

Dugger received extensive training on topics that included TQL's services, pricing structure, sales strategies, customers, and general operations, had access to various types of TQL's trade secrets and confidential information, and, most critically for purposes of this Motion, developed close relationships with and an intimate knowledge of TQL customers. (Ver. Compl. ¶ 15.) Indeed, each was a primary point of contact with the TQL customers with whom each interacted. (*Id.*)

### C.    Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement

Given the power and access provided to its employees, perhaps the most significant weapon TQL has to protect its customer relationships and confidential information is the Employee Non-Compete, Confidentiality and Non-Solicitation Agreement that each employee must sign as a condition of employment. Dugger executed the Agreement as a condition of his employment with TQL. (Ver. Compl. ¶¶ 12-13 & Ex. A thereto.)

The Agreement contained a one-year restrictive covenant concerning several different topics, including, for a period of one year after employment ended, the following prohibitions:

> Employee shall not (directly or indirectly, either as an individual on Employee's own account or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or other on another's account) contact, solicit or accept business from, render any services to, give assistance to, or accept any compensation from any Customer or customer prospect of TQL. ...

> Further, Employee hereby agrees that Employee shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business competition with the business of TQL, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on Employee's own account, or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise of another...

> ... It is further understood and agreed that the running of the one (1) year set forth in this Section shall be tolled during any time period during which Employee violates any provision of this Agreement.

6

(Ver. Compl., Ex. A thereto § 9.) The Agreement defines "Competing Business" as "any person, firm, corporation, or entity that is engaged in third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States." (*Id.* § 5.)

The Agreement also contains, *inter alia*, a one-year prohibition against soliciting any TQL customers or motor carriers with which TQL does business, otherwise taking action to divert business from TQL, interfering with or attempting to disrupt TQL's relationships, contractual or otherwise, with current or prospective customers or motor carriers, or soliciting TQL employees or former employees. (*Id.*, Ex. A thereto § 9.) The Agreement also contains Dugger's promise not to disclose or otherwise use any of the TQL's confidential information, including operating policies and procedures, financial records (such as information about customers), transaction history and other information, pricing information, terms of business dealings with customers, marketing and sales strategies, and customer lists and related information. (*Id.*, Ex. A thereto §6).)

Dugger acknowledged that the restrictions set forth in the Agreement and discussed herein and agreed that, "Employee's engaging in any form of employment relationship with a Competing Business, as defined herein, will be presumed to necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL." (Ver. Compl., Ex. A thereto § 5). Dugger further agreed that in the event of a breach or threatened breach of any restriction, TQL would be entitled to an injunction restraining such activity. (*Id.* § 10(a).)

7

**D.     Dugger's Employment with Traffic Tech, and Traffic Tech's Knowledge of Improper Activities.**

After leaving TQL, but before the expiration of the one-year restrictive covenant, Dugger began working for Traffic Tech, a direct TQL competitor. (Ver. Compl. ¶¶ 16.) When Dugger left TQL, he informed them that it was because he had an offer for a better paying job, (Aff. of Marc Bostwick, ¶2 attached hereto as Exhibit C), presumably with Traffic Tech. TQL has already become aware that Dugger has been improperly soliciting the customers he serviced while at TQL. (Ver. Compl. ¶16). On October 12, 2021, TQL received an email from a current customer, which mistakenly sent the email to Dugger's TQL email address. (See, "Traffic Tech Credit Application, October 12, 2021" attached hereto as Exhibit D). The email chain revealed that Dugger, in his position at Traffic Tech, was signing up the largest customer he had while employed at TQL. (*Id.*) The precise extent to which Dugger has used or disclosed TQL's confidential information, solicited TQL's customers, and otherwise competed with TQL beyond this instance is currently unknown, but the threat of the same, especially given the fact he has already engaged in such behavior, the information to which he had access at TQL and the fact that he was the primary point of contact certain customers had with TQL, is imminent on a daily basis. Given that Dugger has assumed a similar, if not the same, role that he had while working with TQL for Traffic Tech, it is a virtual certainty that he will continue taking actions in violation of the Agreement that cause TQL to lose business to Traffic Tech. (Ver. Compl, ¶¶ 3, 15-16.)

Traffic Tech continues to employ Dugger despite knowledge of his restrictive covenants and the obligations contained in the Agreement, including but not limited to the non-compete provision, non-solicitation provision, and the prohibition against disclosing or using TQL's confidential information. (*Id.* at ¶19).

## III.   LAW AND ARGUMENT

To obtain a temporary restraining order, TQL must demonstrate: (1) that it has established a substantial likelihood of success on its claims in the Verified Complaint; (2) a threat of irreparable harm from the improper conduct; (3) third parties would not be unjustifiably harmed by an injunction; and (4) the public interest will be served by the order of injunctive relief. *Valeo Cincinnati, Inc. v. N&D Machinery Serv., Inc.*, 24 Ohio St.3d 41,492 N.E.2d 814 (1986); *Franks v. Rankin*, 10th Dist. No. 11AP-962, 2012-Ohio-1920, ¶¶28, 36.  No one factor is dispositive; instead, the Court balances the factors to determine whether the sought relief is appropriate. *Cleveland v. Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d 1, 12, 684 N.E.2d 343 (8th Dist. 1996).

### A.   TQL is Likely to Succeed on the Merits.

   1.   *The Restrictive Covenant Provisions Contained In the Agreements Are Enforceable and Dugger Violated Those Provisions*

Initially it should be noted that the non-compete is essential to protect TQL's legitimate business interests. *See Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 26, 325 N.E.2d 544 (1975). As noted, TQL operates in a hyper-competitive industry centered on developing and maintaining customer relationships.  Accordingly, TQL expends significant resources generating information helpful in accomplishing this and protecting that information.  TQL extensively trains its sales personnel, like Dugger once was, on this topic and gives them access to customer-related information to assist TQL's competitive advantage.  All sales personnel are required to sign contracts that extensively detail how to handle, use, and protect this information.

Customer information is precisely the type of information that could be used to unfairly compete with TQL. A competitor, such as Traffic Tech, would be given the keys to the front door,

so to speak, of a TQL customer from an individual who held significant positions at TQL.  TQL has a legitimate business interest in protecting this type of information.

In addition, Courts will assess the following nine factors to determine whether a covenant is enforceable.  *Raimonde*, 42 Ohio St.2d at 25.  The covenant at issue here satisfies each factor:

**Time/space limitations**:  One year is a relatively short window for a restriction in an industry as competitive as TQL's and where employees such as Dugger are the primary points of contact with the TQL customers with whom they interacted.  Because TQL's operations are nationwide, a concurrent nationwide geographic limitation is also reasonable and, it should be noted, consistent with other covenants that Ohio courts have enforced.  *See e.g., Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 271 (1st Dist. 2000) (enforcing three-year non-competition provision with worldwide scope); *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382 (10th Dist. 2001).

**Point of contact with customers**:  During Dugger's time at TQL, he was a primary point of contact with each TQL customer with whom he interacted.  Given that he was responsible for cultivating, maintaining, and advancing the customer relationships, this point cannot be overstated.

**Access to Confidential Information**:  Dugger, who had never worked in third-party logistics prior to being employed with TQL, during his employment was in possession of and had access to a trove of confidential information while employed by TQL, including contact information and deep, substantive data regarding customers, how TQL dealt with them and the pricing offered to them, marketing and sales strategies, and TQL's high-level goals and strategies. That information provides a large head start, if not a sort of blueprint, for how to compete with TQL and divert its business to a competitor.

**Elimination of unfair competition**: The Agreement seeks only to address *unfair* competition. Nothing is done to stifle *fair* competition.

**Stifling of inherent skill/experience**: Dugger gained significant skill and experience while at TQL, before which he had no experience in the logistics industry; the skill sets and techniques learned while employed by TQL were not "inherent." With the other parameters in place, the restrictive covenant is narrowly tailored to protect TQL's interests.

**Benefit to employer proportionate to harm to employee**: Again, the only benefit derived by TQL from the Agreement is the prevention of *unfair* competition. Dugger left TQL to work for a direct competitor within the restricted period.

**Bar on sole means of support**: The Agreement does not eliminate Dugger's ability to work. So long as he does not compete against TQL in TQL's industry, use or disclose TQL's confidential information, or solicit TQL's customers, for the proscribed one-year period, Dugger is free to work in the occupation of his choice in the location of his choice.

**Talent developed during employment**: Dugger's experience in the logistics industry started at TQL. He was provided extensive training not only on the industry, but on TQL's specific policies, procedures, and strategies for success in that industry. After working for TQL that information is ingrained in Dugger. TQL is unaware of any other such experience of each prior to employment with TQL.

**Whether forbidden employment is incidental to main current employment**: Dugger, upon information and belief, has assumed a similar, if not precisely the same, position at Traffic Tech as he held at TQL. There is no portion of his current position that would not violate the plain language of the restrictive covenant. In other words, it would be impossible for Dugger to work

at Traffic Tech without violating the Agreement. Thus, the restrictive covenant is reasonable in both scope and content; therefore, it is enforceable against Dugger.

The Agreement contains a one-year non-compete provision and a one-year non-solicitation provision. There can be no dispute that Dugger is in breach of his non-compete obligation by accepting and maintaining employment with a direct competitor, Traffic Tech, and in breach of his non-solicitation obligation by going after his old TQL customers on behalf of Traffic Tech. TQL is likely to succeed on the merits of its breach of contract claims.

2.    *TQL Is Likely to Succeed on its Misappropriation of Trade Secret Claim*

TQL is substantially likely to succeed on the merits as Ohio courts have long protected a company's confidential information and trade secrets from unauthorized disclosure by former employees. *See, e.g., H&H Indus., Inc. v. Miller*, S.D.Ohio No. 2:13-cv-907, 2013 U.S. Dist. LEXIS 181095 (Dec. 27, 2013); *Prosonic Corp. v. Stafford*, 529 F. Supp. 2d 999 (S.D. Ohio 2008); *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493,499 (9th Dist. 1963) (enjoining former employee where disclosure of trade secrets was only "seriously threatened"); *Provac Plant Services, Inc. v. Glass*, 7th Dist. Columbiana No. 99 CO 40, 2000 Ohio App. LEXIS 2959 (June 28, 2000) (enjoining former employee in absence of non-compete and prohibiting employee from soliciting customers); *Fremont Oil Co. v. Marathon Oil Co.*, 92 Ohio Law Abs. 76, 192 N.E.2d 123 (C.P.1963) (granting injunctive relief where former employees disclosed confidential customer lists to their new employer); *Alta Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 785 (S.D. Ohio 1999) (noting that an injunction may be issued when actual or threatened misappropriation of a trade secret occurs).

Indeed, the Ohio General Assembly has codified this standard for employees. Ohio Rev. Code § 1333.81 expressly states that "no employee of another, who in the course and within the

scope of his employment receives any confidential matter or information, shall knowingly, without the consent of his employer, furnish or disclose such matter or information to any person not privileged to acquire it." The right to an injunction prohibiting the unauthorized disclosure of trade secrets or other confidential information "does not depend on the presence or absence of a confidentiality agreement signed by the employee, or for that matter, a noncompete agreement." *Emery Industries, Inc. v. Cottier*, S.D.Ohio No. C-1-78-474, 1978 U.S. Dist. LEXIS 15953, *12 (Aug. 18, 1978); *see also B.F. Goodrich*, 117 Ohio App. at 499 (even in the absence of a confidentiality agreement, a defendant should be restrained from revealing his knowledge of the plaintiff's trade secrets regarding research and scientific processes to his new employer); *Provac Plant Services,* 2000 Ohio App. LEXIS 2959 at *5-*10 (enjoining former employee in absence of non-compete).

Here, the information possessed by Dugger certainly qualifies as trade secrets under Rev. Code § 1333.61. The information is not readily available in the marketplace, and it has great competitive value for TQL's competitors. For example, knowing the details regarding TQL's prices and rates would allow a competitor, such as Traffic Tech, to undercut TQL and take its customers. In sum, the information to which Dugger had access during his tenure with TQL, and which will undoubtedly assist him in competing against TQL, is the exact type of information that Traffic Tech, a freight brokerage, would find useful in attempting to grow its market share and compete against established transportation logistics companies such as TQL.

That is why TQL protects that information from disclosure. It conditions employee access to the information upon use of constantly changing passwords; it requires all employees to sign agreements that include confidentiality and restrictive covenant provisions similar to the Dugger

13

Agreement; and TQL's systems implement internal controls that prevent employees from downloading or printing certain information. (Ver. Compl. ¶ 10.)

Considering Dugger's new position is substantially similar to the position he held at TQL, it is inevitable that he has and will continue to use and/or disclose TQL's confidential and trade secret information. As such, TQL is likely to succeed on the merits of its misappropriation of trade secrets claims.

3. <u>TQL is Likely to Succeed on its Tortious Interference Claims</u>

It is likewise clear that Traffic Tech's conduct constitutes an intentional interference with TQL's contractual relationship with Dugger. "The torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not perform a contract with another." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 2015-Ohio-1600, ¶ 11 (quoting *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 4 (1995)). To prevail on a tortious interference with business relations claim, TQL will be required to demonstrate that: (1) it had a business relationship, (2) known to the wrongdoer, (3) who without privilege to do so takes an intentional action to negatively affect that relationship, (4) resulting in damages. *Id.* A contract based tortious interference claim, however, requires: (i) the existence of a contract, (ii) known to the wrongdoer, (iii) who without justification to do so takes an intentional action to procure the breach of that contract, (iv) resulting in damages. *Id.* ¶ 12. TQL is likely to succeed on the merits of its tortious interference claim against Traffic Tech.

Here, Traffic Tech knew that Dugger was an ex-TQL employee under contract and was even notified  of and sent a copy of Dugger's active non-compete.  Notwithstanding this

14

knowledge, Traffic Tech intentionally interfered with TQL's contractual relationship with Dugger by hiring him and continuing to employ him in the same or a substantially similar position as he held with TQL. Because Traffic Tech knew or should have known that doing so would be a clear breach of the Agreement, it cannot be reasonably stated that Traffic Tech's conduct was privileged or otherwise justified in any way. On the contrary, it was wholly unjustified and improper. TQL is likely to prevail on this claim.

### B. TQL Will Suffer Immediate and Irreparable Harm Without an Injunction.

To obtain an injunction, a plaintiff must also show that it will suffer irreparable injury in the absence of such relief. Even when the threatened harm is monetary, it is considered irreparable if the legal remedy would be speculative or difficult to calculate. *See Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, ¶¶ 82-83. Damages flowing from lost sales, for example, are speculative because the calculation relies on imperfect estimates. *See id.* Damages pertaining to lost customers are likewise speculative because it cannot be determined with certainty how long a customer would continue working with a plaintiff in the absence of the defendant's conduct. *See Penzone, Inc. v. Koster*, 10th Dist. Franklin No. 07AP-569, 2008-Ohio-327, ¶ 23; *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (stating that loss of customer goodwill and fair competition likely to irreparably harm employer). Critically, a plaintiff need not show actual harm; the *threat* of irreparable harm is sufficient. *Convergys Corp. v. Tackman*, 169 Ohio App.3d 665, 2006-Ohio-6616, ¶ 8 (1st Dist. 2006).

Moreover, "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Industrial Co.*, 730 F.2d 61, 63 (2d Cir. 1984). As a result, such a loss cannot be measured in money damages. *Id.* Ohio courts have long protected a company's confidential information and trade secrets from unauthorized disclosure by former employees. *B.F. Goodrich*

*Co*, 117 Ohio App. at 499; *Fremont Oil Co.*, 26 Ohio Op.2d 109 (granting injunctive relief where former employees disclosed confidential customer and route lists to their new employer); *Alta Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 785 (S.D. Ohio 1999) (noting that an injunction may be issued when actual or threatened misappropriation of a trade secret occurs).

Indeed, a "substantial threat of harm exists when a defendant employee 'possesses knowledge of the employer's trade secrets and begins working in a position that causes her to compete directly with the former employer or the product line that the employee formerly supported." *E.g.*, *Prosonic Corp.*, 539 F. Supp.2d at 1008 (citation omitted). Other courts have likewise recognized that "[t]he inadequacy of legal remedies and the threat of irreparable harm are inherent in cases such as these when the destruction of customer goodwill and trade secrets are at issue." *IDS Life Ins. Co.*, 958 F. Supp. at 1282 (citing *Duct-0- Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506,507 (7th Cir. 1994)).

TQL continues to suffer irreparable damage by having its trade secret information reside in the hands of someone who is prohibited from using it, and by a former employee leveraging information and experience he gained at TQL to specifically target TQL's customers. Without immediate injunctive relief, there is a danger and threat each day that the breaching defendant will continue to utilize confidential TQL information and knowingly solicit customers, or to otherwise utilize the vast trove of confidential and trade secret information to which Dugger had access. Dugger is already breaching his contract, and given that he has assumed a similar position at Traffic Tech, and he passed through TQL's extensive training program, it is inevitable that TQL's information will be utilized in those jobs. The harm resulting from this unfair competition, and the resultant damage to TQL's revenues, customer relationships, and goodwill will be difficult, if not impossible, to calculate. Injunctive relief operates not only to put a stop to things that are

occurring; it also serves the critical role of *preventing* irreparable harm from continuing or happening thereafter. This is the entire reason why the threat of irreparable harm is sufficient for purposes of this analysis, though here the harm is already being realized through Dugger's improper solicitations.

Accordingly, TQL has satisfied this element of the injunctive relief analysis.

**C.      No Third Parties Would Suffer Harm as a Result of the Requested Injunction.**

When determining whether to grant injunctive relief, courts also consider the potential harm to third parties posed by the proposed injunctive relief. *Brakefire, Inc. v. Overbeck*, 144 Ohio Misc.2d 35, 2007-Ohio-6464, 878 N.E.2d 84, ¶¶ 62-64 (Clermont C.P.). No third parties will suffer any harm if the injunction is granted.

Courts also consider the potential injury to the defendant against the harm that the plaintiff will suffer if an injunction is denied. *See Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d 1, 12, 684 N.E.2d 343 (8th Dist. 1996). Where the only potential harm falls on a defendant because of its inability to further violate a contract or the law, this factor will weigh in the plaintiff's favor. *See generally Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio) (concluding that enforcement visited no harm because defendant was aware of the restrictive covenants and "[a]ny harm to [him] would be as a direct result of his own actions").

Here, Dugger is the only party who could be "harmed" by issuance of the injunction. But such harm would only mean that he is prohibited from unfairly competing, which the law provides he is already not allowed to do anyway. On the other side, any such harm Dugger would suffer is far outweighed by the detrimental impact on TQL's ability to compete fairly and to safeguard its confidential information, customer relationships, and goodwill. Defendants should not be

permitted to continue benefitting from the knowing breach of contractual duties. Therefore, the equities favor issuing the injunction.

### D.    The Public Interest is Promoted by Issuance of the Injunction.

As a general matter, upholding and enforcing contracts is in the public interest. *See Century Bus. Servs., Inc. v. Urban*, 179 Ohio App.3d 111, 2008-Ohio-5744, ¶ 17 (8th Dist.). Enforcing valid agreements demonstrates to the public that its contracting members can rely upon the mutual promises and obligations contained in their existing agreements. *See Clifton Steel Co. v. Trinity Equip. Co.*, 8th Dist. Cuyahoga No. 105675, 2018-Ohio-2186, ¶ 43. "Persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *Id.* Conversely, if contracts are routinely not enforced, parties will be disinclined to contract, hampering business transactions both large and small. As such, Dugger must be enjoined from further violating the Agreement, which he voluntarily signed. Additionally, Traffic Tech must be enjoined from further violating its Settlement Agreement, which it voluntarily signed.

Furthermore, courts recognize that there are overriding public interests in ensuring that competitors in the marketplace compete in a manner that is both lawful and proper. *See Cabot Corp. v. King*, 790 F. Supp. 153, 158 (N.D. Ohio 1992). As one court recognized: "[t]he public has no interest in destroying contracts, rewarding theft, and encouraging unethical behavior." *IDS Life Ins. V. Sun America, Inc.*, 958 F. Supp. 1258, 1283 (N.D. Ill. 1997), *aff'd in part, vacated in part*, 136 F.3d 537 (7th Cir. 1998). Defendants cannot be permitted to continue engaging in or encouraging improper behavior to help it get a leg-up on competitors.

Finally, the freight brokerage and third-party logistics industries are central to the functioning of businesses of all kinds throughout the country. The freight brokerage industry impacts virtually all industries in a way that few industries do. It is of paramount importance that

18

all business entities, including TQL's customers, can rely upon the safe, efficient, and effective functioning of the freight brokerage industry, the functioning of which depends upon the enforceability of its contracts.

      **E.      TQL Would Suffer Irreparable Harm in the Time it Would Take to Give Defendants an Opportunity to be Heard.**

TQL faces continued imminent harm if the injunction is not issued in the form of a temporary restraining order. Dugger has already committed breaches of the Agreement with TQL and, given his unlawful actions already committed on behalf of Traffic Tech, it is inevitable that this will continue to occur on a daily basis. Traffic Tech, additionally, has breached its contract with TQL, despite being informed of Dugger's non-compete. Traffic Tech does not appear interested in stopping Dugger's breaches, or its own, despite knowledge of the restrictions on Dugger, and it is instead providing a platform and resources for Dugger to continue with this conduct.

TQL has, however, provided notice of this Motion, the Verified Complaint, and other related filings to Dugger and Traffic Tech's corporate counsel via email.

**IV.    CONCLUSION**

For the foregoing reasons, TQL respectfully requests that the Court enter a temporary restraining order, in the form of the proposed order submitted herewith.

Respectfully Submitted,

/s/ Matthew J. Wiles
Matthew J. Wiles (0075455)
Kelli J. Amador (0095550)
Dinsmore & Shohl LLP
191 W. Nationwide Blvd.
Suite 300
Columbus, Ohio 43215
Matthew.wiles@dinsmore.com

**Attorneys for Plaintiff Total Quality Logistics, LLC**