**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | ) | CASE NUMBER: 1:21-cv-00714 |
| | ) | |
| Plaintiff, | ) | JUDGE TIMOTHY BLACK |
| | ) | |
| vs. | ) | **DEFENDANT NICKOLAS J. DUGGER'S** |
| | ) | **OPPOSITION TO PLAINTIFF TOTAL** |
| TRAFFIC TECH, INC., et al, | ) | **QUALITY LOGISTICS' MOTION FOR** |
| | ) | **TEMPORARY RESTRAINING ORDER** |
| Defendants. | ) | |
| | ) | |

**I.   INTRODUCTION**

Total Quality Logistics, LLC ("TQL")'s Motion for Temporary Restraining Order[1] ("Motion") should be denied because it comes to the Court with unclean hands while, at the same time, asking this Court to invoke its equity powers for the purpose of putting Defendant Nicholas J. Dugger ("Mr. Dugger") out of work. For the first six months of his employment, Mr. Dugger was expected to participate in TQL's training program, which is required of all new hires. However, TQL wrongfully classified Mr. Dugger as an employee "exempt" under the Fair Labor Standards Act and accordingly, failed to pay Mr. Dugger the necessary and appropriate overtimes wages during the time in which he participated, as required, in TQL's training program and thereafter.

Because the law will not assist those in equity who come to the Court with unclean hands, as well as the other well-grounded reasons articulated herein and in Defendant Traffic Tech, Inc.'s

---

[1] In light of the severance of temporary restraining order and preliminary injunction hearings, Mr. Dugger anticipates that additional briefing in advance of the preliminary injunction hearing, following discovery, will be helpful to the Court. Mr. Dugger, therefore, requests that such briefing be permitted in an effort to narrow the issues and provide focus for the preliminary injunction hearing.

1

("Traffic Tech") Opposition to Plaintiff Total Quality Logistics, LLC's Motion for Temporary Restraining Order, TQL's Motion should be denied.

## II. FACTS

For the sake of brevity and judicial economy, Mr. Dugger incorporates the "Facts" section of Traffic Tech Opposition to Plaintiff Total Quality Logistics, LLC's Motion for Temporary Restraining Order as if fully set forth here. However, certain facts worth highlighting and demonstrate that TQL's hands are dirty. Those facts are as follows:

- When Mr. Dugger was hired by TQL for an entry-level position in January 2020. (Declaration of Nickolas J. Dugger ("Dugger Decl.") ¶3, attached as Ex. A.)

- Mr. Dugger was a "TQL Trainee" for six months and was paid a $35,000 salary, which translates to $16.83 per hour had he worked a standard 40-hour work week. But, Mr. Dugger did not work a standard 40-hour work week. (Id. ¶5.)

- Mr. Dugger was required to work nine and a half hour days, from 7:45 AM until 5:15 PM, Monday through Friday. He also was required to work from 8:00 AM until noon, two Saturdays per month. Mr. Dugger worked approximately 49.5 hours per week as a Trainee, amounting to approximately $13.60 per hour. (Id.)

- TQL did not pay Mr. Dugger for the overtime hours he worked. It justified its failure by telling him that he was classified as "exempt" from overtime under the Fair Labor Standards Act ("FLSA"). (Id. ¶6.)

- During the first two weeks as a Trainee, Mr. Dugger attended classroom training that covered industry basics, information about how to use TQL's systems, and information about TQL's operations. (Id. ¶7.)

- After those initial two weeks, Mr. Dugger was not provided any formal training and, instead, he began supporting a TQL Logistics Account Executive ("LAE"), although TQL continued to call this work "training."  Mr. Dugger performed administrative and operations tasks at the LAE's direction.  Mr. Dugger was told what to do, when to do it, and how to do it.  His tasks largely consisted of tracking his assigned's LAE's loads.  Mr. Dugger had no discretion in performing his work, nor did he make any decisions on behalf of TQL.  (Id. ¶8.)

- Around his 3rd or 4th month as a Trainee, Mr. Dugger was allowed to cold call prospective customers while, at the same time, still supporting his LAE.  If Mr. Dugger made a sale, the sale was credited to his LAE and Mr. Dugger did not receive any additional compensation.  (Id. ¶9.)

- Despite being in "training," Mr. Dugger's work during the first six months of his employment with TQL was just that – work.  He worked long hours (in excess of 40 hours per week) in exchange for $35,000, with no overtime pay.  (Id. ¶10.)

- Mr. Dugger left TQL because he was frustrated with his compensation and he had concerns about how TQL calculated and paid commissions.  For example, during training, he was told that commissions were calculated every two weeks.  However, only after he became a LAE did he learn that commissions were calculated every four weeks.  (Id. ¶19.)

- TQL also was not transparent about how it calculated commissions and it was impossible for Mr. Dugger to compare his paycheck with his sales to determine what commissions he had earned.  He called multiple departments within TQL to get answers to his questions, but he never received any clarity on it.  (Id. ¶20.)

- If Mr. Dugger were forced to comply with the Non-Compete Agreement, he does not know how he would be able to support himself. He does not have a college degree, and he has zero professional experience in any other industry. It would be an extreme hardship for him to try to find employment in a brand-new industry. (Id. ¶22.)

- Mr. Dugger does not have any information from his employment with TQL in his possession. He did not steal, download, or retain any documents, emails, PowerPoints, spreadsheets, screenshots or anything of that nature from his TQL employment. He did not forward anything to his personal email account, nor had he committed any TQL information to memory. Further, Traffic Tech expressly instructed Mr. Dugger that he should not bring or use any information from his employment at TQL. (Id. ¶24.)

- Mr. Dugger does not recall any deep, substantive data regarding customers, how TQL dealt with them and the pricing offered to customers, marketing or sale strategies, or TQL's high-level goals and strategies. The only information Mr. Dugger even accessed when he was at TQL was information related to the customers he serviced – none of which is confidential. (Id.)

**III.    ARGUMENT**

    **A.    The Standard Applicable To Motions For A Temporary Restraining Order.**

The standard for granting a temporary restraining order is the same as that for entering a preliminary injunction. *CompuServe, Inc. v. Cyber Promotions,* 962 F. Supp. 1051, 1020 (S.D. Ohio 1997). In order to demonstrate entitlement to preliminary injunctive relief, a plaintiff must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable

harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008). A plaintiff seeking a temporary restraining order, however, must make its showing by clear and convincing evidence. *Patio Enclosures, Inc. v. Herbst,* 39 F. App'x 964, 969 (6th Cir. 2002).

Here, TQL cannot satisfy the relevant legal standard by clear and convincing evidence. Its Motion, therefore, should be denied.

### B. When The Appropriate Factors Are Viewed In Whole, It Is Clear That TQL's Motion Should Be Denied.

TQL's Motion submits that it is likely to succeed on the merits, that it is likely to succeed on the merits, that it will suffer irreparable harm if an injunction does not issue, that the equities tip in its favor, and that an injunction is in the public interest. (Motion for TRO, ECF No. 4, generally.) In case after case that it files to put former employees out of work, TQL makes the same arguments by pointing to a handful of primitive facts, i.e., that the former employee defendants signed the restrictive covenant, received "training," left TQL, and went to work with a competitor. Mr. Dugger, however, suggests that the analysis runs much deeper, and that TQL's employment activities are much more sinister than have been uncovered to date.

Mr. Dugger joins in the sound arguments advanced by Traffic Tech in response to TQL's Motion and incorporates those arguments as if fully set forth here. In addition, Mr. Dugger desperately calls upon this Court to more closely consider the balance of the equities, and to hold TQL accountable for its actions. While TQL and Traffic Tech are well-equipped to battle through protracted litigation – Mr. Dugger is not so blessed. With regard to whether TQL is likely to succeed on the merits of its claims, Mr. Dugger also debunks the myth underlying TQL's assertion that he is at risk of inevitably disclosing TQL's confidential information, to the extent it exists.

    **C.**     **TQL's Motion is Barred by the Doctrine of Unclean Hands.**

        **1.**     **Unclean Hands Preclude The Invocation of Equitable Relief.**

"[H]e who comes into equity must come with clean hands." *Bean v. Bean*, 14 Ohio App. 3d 358, 363, 471 N.E.2d 785, 792 (12th Dist. 1983). The clean hands doctrine requires that where "a party takes the initiative to set into motion the judicial machinery to obtain some remedy but has violated good faith by [its] prior-related conduct, the court will deny the remedy." *Id.* (citing *Keystone Drilling Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, (1933); *Kinner v. Lake Shore & MSR Co.,* 69 Ohio St. 339, 69 N.E.614 (1904)). Thus, the "concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995); see also *Midwest Motor Supply Co. v. Davis*, No. C2-02-531, 2004 WL 4058123, at *3 (S.D. Ohio Apr. 14, 2004) (denying motion for preliminary injunction to enforce non-compete on the basis of unclean hands because employer had hired the employee in violation of employee's prior non-compete agreement).

Failure to pay overtime wages—like other wage and hour violations—constitutes unclean hands and is a defense to the enforcement of a non-compete agreement through an injunction. *See, e.g., SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 585 (Tex. Civ. App. 1966) (concluding that a trial court did not error in refusing to grant a temporary injunction when the evidence suggested that the employer had changed the plan of payment to the employee in breach of the contract's terms); *N. Pac. Lumber Co. v. Oliver*, 286 Or. 639, 660, 596 P.2d 931, 943 (1979) (upholding unclean hands defense to enforcement of non-compete where employer illegally profited off employee's work in resolving claims between third parties); *Chapman Air Conditioning, Inc. v.*

6

*Franks*, 732 S.W.2d 737, 740 (Tex. App. 1987) (upholding unclean hands defense to non-compete enforcement where employer refused employee vacation time); *Schedler v. Fieldturf USA, Inc.*, 3:16-CV-344-JR, 2019 WL 4050515, at *2 (D. Or. Mar. 6, 2019) (applying unclean hands defense to enforcement of employment agreement based on "unpaid wages and commissions").

Here, TQL's unclean hands bars the immediate injunctive relief it now seeks from this Court and, as a result, TQL's Motion should be denied.

### 2. TQL Has Unclean Hands With Regard To Mr. Dugger's Employment, And The Very Training Program That Served As Consideration For The Non-Compete Agreement.

TQL's failure to pay wages is undoubtedly related to its request for injunctive relief. TQL holds up its "extensive training" program as consideration for the Non-Compete Agreement and the primary basis that the Court should grant an injunction. (*See* Complaint, ECF No. 3-1 at Page ID 133 ("TQL provides extensive training on ways to succeed within the Industry."); TRO Motion, ECF No. 4 at PageID 146 ("Dugger [] received extensive training throughout his tenure at TQL, which provided him with TQL's blueprint for how to succeed in the industry."); *Id*. at PageID 148 ("Dugger received extensive training on topics that included TQL's services, pricing structure, sales strategies, and general operations . . ."); *Id*. at PageID 153 ("He was provided extensive training…"); *Id*. at PageID 158 ("…and he passed through TQL's extensive training program[.]"). As such, TQL's training is directly related to its request for a temporary restraining order.

Further, the training program in which Mr. Dugger participated is tainted by reprehensible, grossly inequitable, and unconscionable conduct. Specifically, TQL unlawfully classified Mr. Dugger as exempt under the FLSA and refused to pay him overtime wages. *See State ex rel. Mallory v. Pub. Emp. Ret. Bd.*, 82 Ohio St. 3d 235, 244, 694 N.E.2d 1356, 1363 (1998) (stating that "[a] knowing violation of applicable law would certainly preclude a party" from obtaining

7

equitable relief under the doctrine of unclean hands). Under the FLSA, TQL was required to pay Mr. Dugger—an entry level employee performing administrative work— one and one-half times his regular pay rate for all hours worked in a workweek beyond forty. 29 U.S.C. § 207(1). Here, Mr. Dugger was paid approximately $35,000 in annual salary (the absolute bare minimum for an exempted employee), and required to work nearly 50 hours per week, including every other Saturday. Mr. Dugger received no overtime pay.

TQL will undoubtedly claim that Mr. Dugger was exempt from receiving overtime pay because he allegedly worked in a "bona fide administrative" capacity, *see* 29 U.S.C. § 213(a)(1), which, in relevant part, applies when the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. In a wage and hour action, TQL would bear the burden to show this exception applies. *See Martin v. Indiana Michigan Power Co.,* 381 F.3d 574, 578 (6th Cir. 2004).

Regardless, this exception does not apply. Mr. Dugger worked under the direct and immediate supervision of one of TQL's LAEs. He did not exercise discretion or independent judgment with respect matters of importance. **Mr. Dugger was a Trainee.** He did exactly what the LAE told him to do, how he was told to do it, and when the trainer told him to do it. (Dugger Decl. ¶8); see also Ex. B to Declaration of Pamela Abbate-Dattilo, attached to Traffic Tech, Inc.'s Opposition to Plaintiff's Motion for Temporary Restraining Order ("All new salespeople begin in the LAET role and participate in 6 months of on the job ***training and mentoring*** with a successful Logistics Account Executive while receiving a set salary.") *See also* Sales Opportunity at TQL, available at https://www.youtube.com/watch?v=tvygCPQZq_Y (describing (TQL's promotional video) (describing training program as "[y]our first five months, you come in, you train, you learn

the business, you go out on your own"). Thus, TQL's training program runs afoul of the FLSA and, as a result, TQL has unclean hands.

Indeed, hundreds —if not thousands—of former TQL Trainees have filed or joined wage and hour collective actions across the country against TQL based on this exact wage and hour violation. Defendants have identified three wage and hour class or collective actions against TQL related to this Trainee program. *See Hendricks v. Total Quality Logistics*, LLC, 292 F.R.D. 529, 534 (S.D. Ohio 2013); *Hudgins v. Total Quality Logistics, LLC*, 16 C 7331, 2019 WL 354958, at *1 (N.D. Ill. Jan. 29, 2019); *Daza v. Total Quality Logistics*, LLC, 8:13-CV-3259-T-30JSS, 2015 WL 5758164, at *1 (M.D. Fla. Sept. 29, 2015). In *Daza*, a case in the Middle District of Florida, TQL moved for summary judgment, which was denied. Ultimately, TQL settled the case for "full payment" of the overtime claims and liquidated damages to the lead plaintiff. (*See* Abbate Decl. Ex. C, attached to Traffic Tech Inc.'s Opposition to Plaintiff's Motion for Temporary Restraining Order.) The other two cases—*Hudgins* and *Hendricks*—are in the Northern District of Illinois and the Southern District of Ohio, respectively. A final determination as to liability has not yet been made. In both, TQL did not move for summary judgment, which further suggests that there is merit to the allegations.

But TQL's inequitable conduct did not stop once Mr. Dugger finished his time as a Trainee. After he began as a LAE, TQL precluded Mr. Dugger from seeing how his commissions were calculated, thereby preventing him from verifying whether he was being paid all commissions he was owed.[2] (Dugger Decl. ¶20.) TQL also mislead him into believing commissions were calculated every two weeks when really TQL had changed the schedule so that commissions were

---

[2] Because Mr. Dugger did not take any documents with him from his employment at TQL, the evidence of this misconduct is almost exclusively in the possession of TQL. Mr. Dugger intends to take discovery on this issue prior to a preliminary injunction hearing.

9

calculated once a month. (Id. ¶19); *c.f., e2 Sols. v. Hoelzer*, Franklin App. No. L-08-1295, 2009 WL 426426, 2009-Ohio-772, ¶ 22 (10th Dist. Feb. 20, 2009) (suggesting that, if proven, an employer's "irreparabl[e] damage [to an] employment relationship" could preclude enforcement of a non-compete clause against the employee); *S. Texas & Lone Star Drywall, Inc. v. Young*, Franklin App. No. 77AP-140, 1977 WL 200617, at *3 (10th Dist. Dec. 6, 1977) (noting that, as a corollary to the doctrine of unclean hands, "the loyalty of service of an employee is due an employer only so long as the employer . . . . discharges his duties to the employee").

In summary, while TQL claims, with indignation, that Mr. Dugger's actions "fly in the face of the governing contract" (Motion for TRO, ECF No. 4 at PageID 144), it is TQL's actions that are egregious. Since TQL failed to treat Mr. Dugger equitably, it cannot now avail itself of this Court's equitable remedies. The Court should therefore reject TQL's request for emergency injunctive relief "[g]iven the potential strength of this equitable defense." *See Total Quality Logistics, LLC v. III's Hotshot, Inc.*, Case No. 1:17CV352, 2017 WL 5972001, at *4 (S.D. Ohio Dec. 1, 2017) (refusing to grant injunction because the Court was "unable to determine whether TQL's claims are barred by the equitable doctrine of laches").

    **D.**    **TQL's Inevitable Disclosure Theory of Misappropriation Will Fail.**

Moving on to misappropriation, TQL does not claim Mr. Dugger has *already* disclosed confidential information or trade secrets to Traffic Tech. (*See* ECF No. 4 at Page ID 150 ("The precise extent to which Dugger has used or disclosed TQL's confidential information . . . is currently unknown. . . .").) TQL instead argues that Mr. Dugger will *inevitably* disclose its pricing and rates to Traffic Tech, which would allegedly allow Traffic Tech to undercut TQL and take its customers. (*See* id. at Page ID155-56). TQL's misappropriation claim (or rather, theory) is unlikely to succeed.

Traffic Tech has *no use* for TQL's prices or rates. Traffic Tech pricing is set by its own internal pricing models, and the pricing of its competitors are not considered. (Dugger Decl. ¶25.) Whatever little knowledge Mr. Dugger has of TQL's pricing does not give Traffic Tech a competitive advantage over TQL. *See Dexxon Digital Storage, Inc. v. Haenszel*, 2005-Ohio-3187, ¶ 29, 161 Ohio App. 3d 747, 753, 832 N.E.2d 62, 66 ("To constitute a trade secret, the information must be both unique and ***competitively advantageous***." (emphasis added)); *Hydrofarm, Inc. v. Orendorff*, 180 Ohio App.3d 339, 344, 905 N.E.2d 658, 662 (10th Dist. 2008) (noting that the information must "afford[] the rival entity an irreparable competitive advantage over the plaintiff.").

Moreover, TQL's reliance on the "inevitable disclosure" doctrine wholly fails. TQL must prove "[a]ctual or threatened misappropriation" to obtain an injunction. R.C. § 1333.62.³ The inevitable disclosure doctrine allows a plaintiff to establish that threat through "facts establishing that an employee with ***detailed and comprehensive knowledge*** of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Dexxon Digital Storage, Inc. v. Haenszel*, 161 Ohio App. 3d 747, 755, 832 N.E.2d 62, 68, 2005-Ohio-3187, ¶ 51 (5th Dist. 2005)(emphasis added). Mr. Dugger was a Trainee and lacked "detailed and comprehensive knowledge" of TQL's purported trade secrets. This doctrine, therefore, does not apply.

---

³ In its motion, TQL cites to R.C. § 1333.81, which prohibits an employee from "knowingly, without the consent of his employer, furnish[ing] or disclos[ing] [confidential] information to any person not privileged to acquire it." But—again—TQL has not alleged that Mr. Dugger has actually *disclosed* confidential information or trade secrets to Traffic Tech. (*See* Complaint, ECF No. 3 at PageID 127-28 (alleging that Dugger "used" TQL's trade secrets and confidential information), Motion for TRO, ECF No. 4 at PageID 150 & 155-56 (arguing that disclosure is inevitable, but acknowledging that the extent to which Dugger has already disclosed trade secrets or confidential information is "currently unknown").)

Further, the inevitable disclosure theory is generally applied to high-level employees with considerable experience and "specialized knowledge." *See, e.g.*, *Berardi's Fresh Roast, Inc. v. PMD Enterprises, Inc.*, Cuyahoga App. No. 90822, 2008 WL 4681825, 2008-Ohio-5470, ¶¶ 3–4, 27 (8th Dist. Oct. 23, 2008)(employee was the original founder of the company); *Hydrofarm, Inc.*, 180 Ohio App.3d at 348 (employee with fourteen years of sales and marketing experience); *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 265, 747 N.E.2d 268, 271 (1st Dist. 2000)(employee with a master's degree in marketing who worked as senior-level manager, was responsible for international marketing, and took part in formulating ex-employer's global business goals and strategies), *Litig. Mgt., Inc. v. Bourgeois*, Cuyahoga App. No. 95730, 2011 WL 2270553, 2011-Ohio-2794, ¶ 2 (8th dist. June 9, 2011)(employee was "chief operating officer"). Dugger does not possess the "specialized knowledge" or high-level experience that the inevitable disclosure doctrine requires.

Even further, Mr. Dugger disclaims having "detailed and comprehensive" knowledge of TQL's confidential information and trade secrets. (Dugger Decl. ¶ 24.) Indeed, fatal to TQL's misappropriation claim, the Verified Complaint does not allege any specifically "detailed and comprehensive" trade secrets that Mr. Dugger could even inevitably disclose (See ECF No. 3, generally.) To the contrary, TQL, true to form, makes only broad and sweeping allegations that "the confidential TQL information identified above are TQL's trade secrets" and that "Dugger's misconduct and wrongful taking of *this information* constitutes misappropriation." (ECF No. 3 at PageID 128 (emphasis added).) A critical failure on TQL's part, the alleged trade secrets "referenced above" are not identified anywhere within TQL's Verified Complaint. Therefore, it is not even clear what purported trade secrets Mr. Dugger might disclose, inevitably or otherwise.

12

Nevertheless, Mr. Dugger's knowledge is limited to the customers he serviced in his short time at the company, and that information is not confidential or a trade secret of TQL. (Dugger Decl. ¶24.) Moreover, Traffic Tech has repeatedly instructed Mr. Dugger not to disclose any TQL trade secrets or confidential information. (Id.) *See Eng'g Excellence, Inc. v. Meola*, Franklin App. No. 01AP-1342, 2002-Ohio-5412, ¶ 27 (10th Dist. Oct. 8, 2002)(affirming rejection of misappropriation claim where new employer's vice president testified that he "was not aware of any confidential information that [employee] had shared with [the new employer]").

Additionally, Mr. Dugger's focus for Traffic Tech differs significantly from his work for TQL. Traffic Tech offers international shipment services and customers brokerage. TQL does not. Instead, it focuses on domestic shipments via truck. *See Total Quality Logistics, LLC v. OTC Logistics LLC*, 1:19-CV-151, 2019 WL 1300223, at *3 (S.D. Ohio Mar. 21, 2019)(noting that TQL's Agreement was overbroad and should be limited "the trucking brokerage industry"). Mr. Dugger's sales efforts are significantly different from his role at TQL in that he is focused on generated international shipments and clientele. (Dugger Decl. ¶18.) Accordingly, it is not inevitable that he will disclose TQL information. In sum, TQL has not demonstrated by clear and convincing evidence that such disclosure is inevitable, and that Traffic Tech would gain a competitive advantage as a result. Nor can it. Again, Traffic Tech has no use for TQL's pricing or rates.

## IV. CONCLUSION

For the foregoing reasons, Mr. Dugger respectfully requests that the Court deny TQL's Motion for Temporary Restraining Order.

13

Respectfully submitted,

*/s/ Robin D. Miller*
Robin D. Miller (0074375)
Stites & Harbison PLLC
5325 Deerfield, Blvd.
Mason, Ohio 45040
Phone: (513) 445-6597
E-Mail: rmiller@stites.com

*Attorney for Defendant Nickolas Dugger*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2021, this document was electronically filed via the Court's authorized electronic filing system and that a copy of the foregoing was served via electronic mail upon all counsel of record.

*/s/ Robin D. Miller*
Robin D. Miller

805383:1