**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No. 1:21-cv-714 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| TRAFFIC TECH, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING IN PART PLAINTIFF'S MOTION**
**FOR TEMPORARY RESTRAINING ORDER (Doc. 4)**

This civil action is before the Court on Plaintiff's motion for a temporary restraining order ("TRO") and a preliminary injunction[1] (Doc. 4) and the parties' responsive memoranda. (Docs. 5 and 6). Also before the Court is Defendant Traffic Tech's motion for leave to file a sur-reply. (Doc. 14).

## I. BACKGROUND

Plaintiff Total Quality Logistics, LLC ("TQL") is an Ohio limited liability company with its principal place of business in Clermont County, Ohio. (Doc. 3 at ¶ 2). TQL provides freight brokerage services and third-party logistics services to customers across the continental United States. (*Id.*).

Defendant Traffic Tech Inc. is an Illinois limited liability corporation with its principal place of business in Chicago, Illinois. (*Id.* at ¶3). Insofar as it is also a third-

[1] Plaintiff's motion clearly seeks both a TRO and a preliminary injunction. (Doc. 4). However, both parties have request expedited discovery before briefing a preliminary injunction. (Doc. 4 at PageID# 144; Doc. 8, PageID# 190, n.1). For that reason, the Court will now only decide the question of a TRO.

party logistics provider for freight services, Traffic Tech is a competitor of TQL. (*Id.*).

Defendant Nickolas Dugger, a Florida resident, is a former employee of TQL. (*Id.* at ¶¶4). Dugger worked for TQL in Florida from January 6, 2020 to September 24, 2021 in the positions of Logistics Account Executive Trainee and Logistics Account Executive. (*Id.* at ¶¶ 4, 14). TQL contends that Dugger received extensive training from TQL and had access to TQL's trade secrets and confidential information. (*Id.* at ¶15).

As a TQL employee, Dugger signed TQL's "Confidentiality Agreement and Restrictive Covenant" (the "Agreement"). (Doc. 3-1). The Agreement contains the following one-year restrictive covenant:

> During employment with TQL, and for a period of one (1) year immediately following termination of Employee' employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, Employee shall not (directly or indirectly, either as an individual on Employee's own account or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise on another's account) contact, solicit or accept business from, render any services to, give assistance to, or accept any compensation from any Customer or customer prospect of TQL. A customer prospect is any business, company, individual, partnership, or entity, including former Customers, with which TQL or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of TQL within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.
>
> Further, Employee hereby agrees that Employee shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of TQL, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on Employee's own account, or as a partner, Joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise of another, for a period of one (1) year after the date of the termination of Employee's employment with TQL.

2

(*Id.* at §9). The Agreement defines "Competing Business" as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the Continental United States." (*Id.* §5). The Agreement prohibits Dugger from soliciting any TQL customers or motor carriers, taking action to divert business from TQL, interfering with or attempting to disrupt TQL's relationships, or soliciting TQL employees or former employees. (*Id.* at §9).

The Agreement also prohibits Dugger from disclosing or using any of TQL's confidential information, including operating policies and procedures, financial records, transaction history, pricing information, terms of business dealing with customers, marketing and sales strategies, and customer lists and related information. (*Id.* at §3).

Defendants admit to many of TQL's allegations. Dugger did take a job with Traffic Tech, a competitor of TQL, within one year of leaving TQL. (*See* Declaration of Nickolas J. Dugger, "Dugger Declaration," Doc. 7-1, at ¶21). United Pipe, Dugger's biggest client, did start working with Traffic Tech when Dugger moved there himself.[2] (*Id.* at ¶17). United Pipe now represents 60% of Dugger's business at Traffic Tech. (*Id.*). However, Dugger denies taking or using confidential information or trade secrets. (*Id.* at ¶24).

---

[2] Although the Court finds the precise circumstances are left unclear, Dugger declares that "several" of his TQL clients sought him out through his personal contact information. (Dugger Declaration at ¶¶15,17). In other words, Dugger did not actively reach out to those clients once he started work with Traffic Tech. Dugger does not say, though, exactly how United Pipe came to be his client at Traffic Tech.

Dugger and Traffic Tech allege an additional body of facts about TQL's employment practices.  The gist is that TQL mistreated Dugger.  For example: TQL wrongly classified Dugger as exempt under the Fair Labor Standards Act ("FLSA") (*Id.* at ¶13); TQL changed the commissions policy without notice (*Id.* at ¶19); and TQL overworked and underpaid Dugger. (*Id.* at ¶21).

Lastly, according to TQL, another TQL ex-employee previously took a position with Traffic Tech, which likewise occasioned litigation. (Doc. 3 at ¶17).  TQL asserts that the two companies settled that prior case with a settlement agreement. (*Id.*).  TQL further asserts that by hiring Dugger, Traffic Tech is in breach of that settlement agreement. (*Id.* at ¶¶17-18).  However, this settlement agreement has not been entered into the record.

## II.    STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'"  *Reid v. Hood*, No. 1:10-CV-2842, 2011 WL 251437, at \*2 (N.D. Ohio Jan. 26, 2011) (quoting *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996)).  "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo."  *Id*. (citing *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977)).

Plaintiff bears the heavy burden of demonstrating his entitlement to injunctive relief.  An "injunction is an **extraordinary remedy** which should be granted only if the

4

movant carries his or her burden of proving that the circumstances <u>clearly</u> demand it."
*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)
(emphasis added).

In determining whether to grant injunctive relief, this Court must weigh four
factors: (1) whether the moving party has shown a strong likelihood of success on the
merits; (2) whether the moving party will suffer irreparable harm if the injunction is not
issued; (3) whether the issuance of the injunction would cause substantial harm to others;
and (4) whether the public interest would be served by issuing the injunction. *Hall v.
Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). These four
considerations are factors to be balanced, not prerequisites that must be met. *McPherson
v. Mich. High Sch. Athletic Ass'n, Inc*., 119 F.3d 453, 459 (6th Cir. 1997). "Although no
one factor is controlling, a finding that there is simply no likelihood of success on the
merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th
Cir. 2000).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

##### 1. *Breach of Contract*

TQL argues that the restrictive covenants in the Agreement are enforceable
because they are reasonable and protect TQL's legitimate business interests. The
Supreme Court of Ohio has held that "[a] covenant restraining an employee from
competing with his former employer upon termination of employment is reasonable if the

restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah,* 325 N.E.2d 544, 544 (Ohio 1975).

Courts consider the following nine factors in assessing the reasonableness of a non-compete agreement: (1) whether the covenant imposes temporal and spatial limitations, (2) whether the employee had contact with customers, (3) whether the employee possesses confidential information or trade secrets, (4) whether the covenant bars only unfair competition, (5) whether the covenant stifles the employee's inherent skill and experience, (6) whether the benefit to the employer is disproportionate to the employee's detriment, (7) whether the covenant destroys the employee's sole means of support, (8) whether the employee's talent was developed during the employment, (9) and whether the forbidden employment is merely incidental to the main employment. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 544). If a non-compete agreement is unreasonable, courts are empowered to modify the terms to create a reasonable covenant between the parties. *Rogers v. Runfola & Assoc. Inc.*, 565 N.E.2d 540, 544 (Ohio 1991).

### Time and Space Limitations

The one-year duration is "facially reasonable." *Ak Steel Corp., v. Miskovich, No.* 1:14CV174, 2014 WL 11881029, at *15 (S.D. Ohio Apr. 17, 2014). Defendants make no complaints about the one-year time frame.

6

On the other hand, Defendants do object to the "nationwide scope" of the restrictive covenant. (Doc. 8 at PageID#201). The Court disagrees that the scope is unreasonable. TQL has a nationwide scope of operations. *See Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 271 (1st Dist. 2000). In the context of a company conducting third-party logistics for clients across the country, a nationwide scope is logical.

The Court finds the time and space limitations of the Agreement are reasonable.

**Contact with Customers**

There is little to dispute here. Dugger engaged with clients at TQL. His client-facing responsibilities directly led to United Pipe moving its business from TQL to Traffic Tech. Traffic Tech's arguments here address mitigating circumstances and hypothetical scenarios that would result from enforcement of the Agreement. The Court does not need to engage in every hypothetical scenario that the Agreement may address. Here, there is no doubt that Dugger was and is client-facing. This weighs in favor of TQL's position.

**Confidential Information Trade Secrets**

The Court here must analyze whether Dugger had access to confidential information and trade secrets. The Court will analyze trade secrets in its own section, *infra*, and speak only to confidential information here.

TQL does not provide clear and convincing evidence that Dugger had access to confidential information. TQL asserts confidentiality over several categories of

documents with boiler-plate labels like "high-level goals and strategies" and "deep, substantive data regarding customers." (Doc. 4 at PageID# 152). These assertions are not backed up by evidence other than a verified complaint with similarly vague language. It is TQL's burden to show confidential information is at-risk and its boilerplate assertions simply do not pass muster. The Court is aware that customer contact information may be regarded as confidential. But Dugger, without contradiction, states that TQL required him to use his personal phone and said nothing about deleting contacts on his way out the door. (Dugger Declaration at ¶15). This suggests TQL did not seriously regard this information as confidential.

This factor favors Defendants.

**Limiting Unfair or Ordinary Competition**

This factor considers whether the Agreement prohibits not only unfair competition but stifles ordinary competition.

The breadth of the Agreement suggests it restrains more than unfair competition. By its terms, an employee could not "accept compensation" from any "customer prospect." (Doc. 3-1 at §9). Given the reach of TQL, such a provision would seemingly wall-off TQL's ex-employees from working from almost any company that wants to ship freight in the United States—not just third-party logistics companies.

As applied to Dugger, though, the non-solicitation provision is reasonable because it protects existing customer relationships from unfair encroachment by third parties. Such provisions are routinely upheld in restrictive covenants. *See, e.g., Basicomputer*

*Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).  This factor weighs in favor of TQL.

### Stifle Employee's Inherent Skills/Employees Skills Developed During Employment/Benefit to Employer and Detriment to Employee/Employee's Sole Means of Support

The Court must here weigh the stifling effect of the restrictive covenant on the "inherent" skills of the employee.  It seems obvious Dugger has some skill in client relationships and sales. Whether that skill is "inherent" or the product of TQL's training is unclear. Dugger mentions that he "learned" from the account executive he trained under, but he also suggests his learning was just a product of his work rather than from more traditional teaching. (Dugger Declaration at ¶10).

It is possible Dugger's sole means of support is threatened.  Dugger persuasively declares that were he restrained from working in third-party logistics "it would be an extreme hardship" for him to find employment "in a brand-new industry." (*Id.* at ¶22). Dugger has no college degree and no other work experience. (*Id.* at ¶¶2, 3, 22).  The Court will not go as far as to conclude that he has no transferrable skills—and, in fact, Duggar does not go that far himself.  It is nonetheless reasonable for Duggar to be concerned about his ability to make a living in a new line of work.

The comparative benefit to the employer and detriment to the employee is straightforward.  Dugger would lose a career advancing opportunity, one with higher pay and more job responsibilities than his previous position at TQL.  (Doc. 7 at ¶16).  Traffic Tech may lose an employee and a newly-obtained client, although it arguably obtained both through improper means.  Enforcement of the restrictive covenant would benefit

9

TQL by discouraging ex-employees from soliciting clients to competitors.

While close, the Court finds these collectively-analyzed factors lean toward TQL.

**Forbidden Employment Incidental to the Main Employment**

Defendants argue Dugger's role at Traffic Tech is broader than his role at TQL because it includes international shipments. (Dugger Declaration at ¶18). As this Court implied in *Concentrix v. Daoust*, though, a broader geographical scope does not render the jobs dissimilar. 1:21-CV-131, 2021 WL 1734284, at *14 (S.D. Ohio May 3, 2021). Here, the Court finds the forbidden employment is similar to the main employment.

Weighing all the above factors, the Court concludes that TQL's agreement is overbroad in the abstract but reasonable and enforceable as applied to Dugger's solicitation, even passively, of TQL's clients. Here, on a limited record, the Court cannot propose a precise revision to the Agreement that would make it "reasonable" in all respects. However, the Court does conclude that TQL has a likelihood of success on its breach of contract claim with an appropriately narrowed agreement—one that would include a prohibition on client solicitation.

### 2. *Misappropriation of Trade Secrets Under Ohio Law*

Under Ohio law, a "trade secret" is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code. § 1333.61(D); *see also Handel's Enterprises, Inc. v. Schulenburg*, 765 Fed. App'x. 117, 122 (6th 2019) (applying Ohio law).

"An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id*.

To succeed on a claim under this statute, a plaintiff must demonstrate the following by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *MEMC Elec. Materials, Inc. v. Balakrishnan*, No. 2:12-cv-344, 2012 WL 3962905, at *6 (S.D. Ohio Sept. 11, 2012) (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)).  Under the inevitable disclosure doctrine, a threatened misappropriation of trade secrets can be shown by "facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Polymet Corp.*

*v. Newman*, Case No. 1:16-cv-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016)

(citing *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

TQL cites a wealth of cases on the law of trade secrets but provides almost no

factual foundation that would establish an at-risk trade secret, let alone one that has been

misappropriated or will be inevitably disclosed.  In its motion, TQL asserts that the

"information possessed by Dugger certainly qualifies as a trade secret" and "the

information is not readily available in the marketplace." (Doc. 4 at PageID# 155).  The

Court is left wondering what "information" TQL is referencing.  This section of TQL's

motion contains no citations to evidence nor any examples of specific trade secrets.

TQL's verified complaint manages to make its trade secret claims only a little

more discrete.  The complaint alleges that "TQL provided Dugger …with extensive

training on topics that included its services, pricing structure, sales strategies, customers,

and general operations.  Dugger developed close relationships with and an intimate

knowledge of certain TQL customers, and had access to TQL's trade secrets and

confidential information." (Doc. 3 at ¶15)

But even here, the alleged trade secrets are abstract and it is difficult to impute

value to them.  Dugger was trained on seemingly basic topics about TQL's busines.

Separately, TQL alleges Dugger had "access to" trade secrets.  It is unclear if the

trainings are the trade secrets or if the two exist separately.  The Court's confusion is not

just a nit-pick. "[T]he existence of the trade secret" is an indispensable element of TQL's

misappropriation claim, and TQL here carries a heavy burden. *MEMC Elec. Materials,*

12

2012 WL 3962905, at *6 (S.D. Ohio Sept. 11, 2012).

Construing the training topics—TQL's services, pricing structure, sales strategies, customers, and general operations—as the relevant "trade secret" does not save TQL here. This is because TQL merely asserts these things have an independent value from not being generally known.[3]  Meanwhile, declarations from Defendants suggest that customer pricing, to take one example, is not actually a trade secret because quotes are widely-disclosed in the industry and that the dynamic world of third-party logistics renders old bids worthless moving forward.  (*See* Declaration of Brian Stapleton, Doc. 11 at ¶¶8-9).  TQL has not yet evidenced other potential misappropriation of trade secrets.

It is true that TQL may prevail here by showing the "threat" of misappropriation through the inevitable disclosure doctrine. *See Polymet*, 2016 WL 4449641, at *6 (S.D. Ohio Aug. 24, 2016).  But TQL fails to meet the standard or show that TQL will likely do so.  Under the inevitable disclosure doctrine, TQL must show Dugger had "comprehensive and detailed knowledge" of its trade secrets and confidential matters. *Id.* As stated, TQL claims that Dugger went through training on certain, sales-related topics. (Doc. 3 at ¶15).  TQL says close to nothing about the training courses.  TQL's implication seems to be that their standard training course transformed Dugger into a

---

[3] The Court is aware that information in these categories *may be* a trade secret. *See e.g.*, *Exel Inc. v. Xpedient Mgmt. Grp., LLC*, No. 2:17-CV-1076, 2018 WL 456315, at *6 (S.D. Ohio Jan. 16, 2018) ("[I]nformation relating to employer's customer lists, pricing information, sales strategies and business philosophy amounted to trade secrets under Ohio law, where information was only provided to employees with limited access."). But the inquiry will depend on the facts.  In *Excel v. Expedient*, testimony established the likelihood of succeeding on trade secret claims. *Id.*  Here, the Court has nothing before it except bald assertions and broad labels.

holder of valuable trades secrets. (Doc. 13 at PageID# 250). On the record before it, the Court is not ready to credit that implication.[4]

TQL may yet prevail on its misappropriation of trade secrets claim but it does not show a likelihood of success in the present motion. Because the failure to show a likelihood of success on the merits is "usually fatal," the Court will not further analyze TQL's trade secrets claims. *Gonzales*, 225 F.3d 620, 625 (6th Cir. 2000).

### 3. Tortious Interference Claim

In Ohio, to establish the tortious interference with contract or a business relationship, plaintiff must provide evidence of: "1) a business relationship or contract; 2) defendants' knowledge thereof; 3) defendants' intentional action taken to prevent contract formation, procure contractual breach or terminate a business relationship; 4) lack of privilege [or justification]; and 5) resulting damages." *Parker v. Rice*, 2009 WL 223886, *3 (Ohio Ct.App.); *Brookeside Ambulance*, Inc. *v. Walker Ambulance Serv.*, 112 Ohio App.3d 150, 156–57, 678 N.E.2d 248 (1996).

"The basic principle of a tortious interference action is that one, who is without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 967 (N.D. Ohio 2009) citing *Barilla v. Patella*,

---

[4] Among other considerations, the Court is concerned about a making general observation that on-the-job training on run-of-the-mill topics essentially creates trade secrets. TQL is not arguing for an order that states such specifically. But TQL's unexacting approach to describing the trade secrets at issue leaves the Court with no real sense of where the asserted trade secret ends and basic employment knowledge begins.

14

144 Ohio App.3d 524, 532, 760 N.E.2d 898 (2001).

The record here is too incomplete for the Court to conclude that TQL has a likelihood of success on the merits of its tortious interference claim. The claim in-question is an intent-based tort. It involves questions like "the wrongdoer's *intentional* procurement of the contract's breach." *Ginn v. Stonecreek Dental Care*, 2015-Ohio-1600, ¶ 12, 30 N.E.3d 1034, 1039. Without evidence speaking to whether Duggar approached Traffic Tech or vice versa, the contents of the earlier settlement agreement between Traffic Tech and TQL, and whether Duggar would have continued his employment with TQL but-for an offer from Traffic Tech, it is too premature to determine the likelihood of success on the tortious interference claims.

The Court finds TQL has not proven its likelihood of success on the merits of its tortious interference claim.

### B. Irreparable Harm

The second factor in the injunctive relief analysis is whether the Plaintiff will suffer irreparable harm absent injunctive relief. To demonstrate irreparable harm, Plaintiff must show that it "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578. The Court need only analyze irreparable harm with regards to the cause of action for which TQL has shown a likelihood of success: breach of the restrictive covenant.

TQL contends that damages flowing from Dugger's breach of the restrictive covenant will be difficult to calculate. (Doc. 4 at PageID# 15). The reason is because "it cannot be determined with certainty how long a customer would continue working with a plaintiff in the absence of defendant's conduct." (*Id.* at PageID# 15 (citing *Penzone, Inc. v. Koster*, 10th Dist. Franklin No. 07AP-569, 2008-Ohio-327, ¶23)). Additionally, TQL cites to cases showing the loss of "customer goodwill and fair competition" constitute their own irreparable harm. *Basicomputer* Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992).

The Court agrees. It is undisputed that Dugger's apparent breach has caused TQL's customer United Pipe to start taking bids and working with Traffic Tech. Without injunctive relief, more of Dugger's former clients could do the same. Several cases support the proposition that harm to customer goodwill is irreparable in this context. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019); *Certified Restoration Dry Cleaning v. Tenke*, 511 F.3d 535, 550 (6th Cir. 2007); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). The Court agrees that the loss of customers and the effect of unfair competition is difficult to calculate in monetary terms. As such, the damages qualifie as "irreparable." *Basicomputer*, 973 F.2d at 512 (6th Cir. 1992).

Defendants respond, interestingly, that United Pipe has no goodwill for TQL— only for Duggar. (Doc. 8 at PageID# 208). This is probably correct on its own terms but largely beside the point. It is natural that many customers would identify their loyalty or

16

goodwill with their direct contacts, not the employers of those same contacts. To the Court's mind, this is the justification for reasonable non-solicitation agreements. Because customer-facing employees are often able to capitalize on client relationships to the detriment of their employer, the law permits restrictive covenants, within limits, prohibiting that behavior.[5] To credit the assertion that any goodwill was Dugger's to take with him would call into question the viability of reasonable non-solicitation agreements generally. The Court will not go that far.

Framed in the terms of this case, Dugger should not be able to benefit by exclusively laying claim to United Pipe's customer relationship with TQL, even if it is true that it was Dugger alone who cultivated the United Pipe relationship. Dugger cultivated that relationship with United Pipe while employed by TQL. Similarly, Traffic Tech should not be permitted to capture the customer relationship built by Dugger while he was an employee of TQL.

Traffic Tech unpersuasively attempts to minimize these concerns. Specifically, Traffic Tech states that "[o]n this record, the only harm TQL may experience is that one customer that was not doing business with TQL before Dugger started will stop doing business with TQL now that he is gone." (Doc. 8 at PageID# 208). This is not necessarily true. Dugger had 23 other clients at TQL. (Dugger Declaration at ¶11). If not enjoined, he could freely solicit more of them. It is thus possible TQL "may experience"

---

[5] Presumably, this is the reason why Courts are instructed to analyze, as part of the *Raimonde* factors, whether an employee subject to a non-compete has contact with customers.

yet more harm in the absence of injunctive relief. Taken at face value, Traffic Tech's argument still lacks merit. The inquiry measures whether harm is "irreparable." Irreparable harm can come from the solicitation of many clients—or of just one. TQL has the better argument in suggesting the harm here is irreparable.

### C. Harm to Others

The third factor in the injunctive relief analysis is whether granting the injunction would harm the party enjoined or others. "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

Defendants argue that United Pipe will be harmed if a TRO is granted. (Doc. 8 at PageID# 209). The basis for this contention is a questionable attorney declaration relaying messages from a United Pipe representative. (*See* Declaration of Pamela Abbate-Dattilo, Doc. 9).[6] According to that declaration, United Pipe does not want to work with TQL. (*Id.* at PageID# 212). Thus, if the Court restrains Traffic Tech and Dugger from working with United Pipe, "it would cause a disruption to United Pipe's business." (*Id.* at PageID# 213).

---

[6] The contents of the declaration appear to be definitionally hearsay. Fed. R. Evid. 801(c). It is true that injunctive relief is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and it is possible the Federal Rules of Evidence do not here apply. *See Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust*, No. 1:21-CV-131, 2021 WL 1734284, n.7 (S.D. Ohio May 3, 2021). That said, the logic behind hearsay prohibitions nonetheless applies: the representations are unreliable because they are relayed second-hand.

Setting aside evidentiary issues, the Court finds this conclusion too vague to carry much weight.  United Pipe's suffering is a fair part of the equation here.  But the Court is not on notice of how much United Pipe stands to lose.  The briefing collectively suggests there are many providers in the third-party logistics market—in other words, TQL and Traffic Tech are not the only options.  Thus, at this stage, the Court regards United Pipe's harm as speculative.

Defendants also contend that Dugger will be harmed if the Court grants TQL's motion for a temporary restraining order and that the harm to Dugger would "outweigh" that to TQL. (Doc. 8 at PageID# 206).  Faced with similar contentions, many courts, including this one, have found that ex-employees "willingly entered into the Agreement in order to work at TQL" so "any harm is of [their] own making." *Total Quality Logistics, LLC v. OTC Logistics LLC*, No. 1:19-CV-151, 2019 WL 1300223, at *4 (S.D. Ohio Mar. 21, 2019.  Here, too, Dugger cannot escape the legal consequences of a document he admittedly signed.

However, the record here includes evidence that at least complicates the notions of undue harm and fair consequences.  TQL was Dugger's first professional job. (Dugger Declaration at ¶3).  While at TQL, he signed the restrictive covenant along with "a bunch of new hire paperwork" after he had already started his employment. (*Id.* at ¶4).  Furthermore, according to Dugger, no one explained the import of a restrictive covenant to him. (*Id.*).  Moreover, because Dugger does not have experience in other industries, he is unsure of what he would do to support himself. (*Id.* at ¶22). The Court does not find

19

these equitable factors necessarily "outweigh" the harm to TQL but they are nonetheless worthy of consideration. The Court finds TQL has a persuasive argument here while also taking note of possible harm that could come to Dugger.

### D. Public Interest

The final factor in the injunctive TRO relief analysis is whether granting the injunction would affect the public interest. Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *UZ Engineered Products Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1608, 1081 (Ohio Ct. App. 2001). The public's interest in preventing unfair competition also implicates Traffic Tech's behavior here. While the Court is not ready to declare that Traffic Tech has unfairly competed, it takes note of the unrebutted assertion that Traffic Tech and TQL have an agreement between them that would prohibit Traffic Tech from hiring ex-TQL employees.

The Court also finds the public's interest may be implicated by granting an injunction to a corporation with unclean hands. The Court reviews such concerns *infra*. For now, this factor weighs in favor of granting an injunction.

### E. Unclean Hands

Finally, the Court must address an equitable defense raised by Defendants. They specifically ask that this Court deny TQL's motion for a TRO because TQL has unclean hands. (Doc. 7 at PageID# 173). As noted by Defendants, the "concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such

relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*,52 F.3d 1373, 1383 (6th Cir. 1995). However, "[u]nclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence." *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed.Appx. 776, 784 (6th Cir.2003). "The doctrine is not to be used as a loose cannon depriving a plaintiff of an equitable remedy to which it is otherwise entitled merely because it is guilty of unrelated misconduct." *Midwest Motor Supply Co. v. Davis*, No. C2-02-531, 2004 WL 4058123, at *3 (S.D. Ohio Apr. 14, 2004) (internal quotations omitted).

According to Defendants, TQL's hands are dirtied by bad employment practices, including misclassification of Dugger under the FLSA and a resulting failure to pay overtime. Defendants direct this Court to three wage-and-hour lawsuit alleging similar conduct of TQL, one of which is before this Court and none of which have reached a resolution on the merits.[7] Besides citation to those cases, Defendants' unclean hands argument mostly depends on Dugger's own declarations.

As a threshold matter, the Court finds unclean hands is theoretically an appropriate defense here. TQL disagrees based on its understanding of Ohio law. TQL contends that Ohio law withdraws "unclean hands" as a defense where there is an appropriate damages

---

[7] *See Hendricks v. Total Quality Logistics*, LLC, 292 F.R.D. 529, 534 (S.D. Ohio 2013); *Hudgins v. Total Quality Logistics, LLC*, 16 C 7331, 2019 WL 354958, at*1 (N.D. Ill. Jan. 29, 2019); *Daza v. Total Quality Logistics*, LLC, 8:13-CV-3259-T-30JSS, 2015 WL 5758164, at *1 (M.D. Fla. Sept. 29, 2015).

remedy, such as those available through the FLSA, to address the offending conduct. (Doc. 13 at PageID# 245). This argument rests on the mistaken assumption that the Court's powers to craft equitable preliminary relief under Federal Rule of Procedure 65 are limited by substantive state law. Sixth Circuit case law establishes that the parameters of preliminary injunctive relief is essentially procedural. *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102 (6th Cir.). Because Rule 65 "incorporates traditional equity practice," *Off. Depot, Inc. v. Impact Off. Prod.,* LLC, No. 1:09 CV 2791, 2011 WL 4833117, at *12 (N.D. Ohio Oct. 12, 2011, the Court will not impose here an Ohio-based prerequisite on the assertion of an "unclean hands" defense.[8]

While Defendants are free to demonstrate TQL's unclean hands, they fail at this stage to carry their heavy burden to do so. Dugger's declaration and the existence of TQL-related wage-and-hour cases simply do not clear the threshold of "clear, unequivocal and convincing evidence." *Hoover*, Fed.Appx. 776, 784 (6th Cir.2003). Moreover, even if TQL were liable to Dugger under the FLSA, Defendants would have to additionally show "fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited,* 52 F.3d 1373, 1383 (6th Cir. 1995). While Defendants assert conduct on that level, they provide almost nothing in support. Accordingly, at this stage, the Court is not persuaded that TQL has unclean hands.

---

[8] Having reached this conclusion, the Court **DENIES** as moot Defendant Traffic Tech's motion to file a sur-reply, which would cover the same topic. (Doc. 14).

22

**F.  Appropriate Scope of the Temporary Restraining Order**

Having weighed the above factors, the Court concludes a temporary restraining order is warranted.  As the Court did in *Polymet*, though, the Court must decide on the specific parameters. 2016 WL 4449641, at *8 (S.D. Ohio Aug. 24, 2016).  The Court takes the position that the TRO should track the irreparable harm.  Accordingly, the Court will enter a TRO that prohibits Dugger from contacting or soliciting TQL's customers or former customers, including United Pipe.  The Court will also enjoin Dugger <u>and</u> Traffic Tech from providing any services to United Pipe going forward, until further notice.  The Court will also direct Dugger not to disclose trade secrets or confidential information, although it is unclear if he has any to disclose.

The Court will not, at this moment, order Dugger to terminate his employment or stand down. The possibility of undue harm has led the Court to reach this conclusion.[9] Dugger came to TQL with little experience in employment.  It is plausible he did not realize, at the time he accepted his new employment, that working for Traffic Tech would implicate an agreement he signed with TQL.  With no college degree or experience outside of third-party logistics, Dugger may not be able to find work if the Agreement were enforced to the letter.  While further factual evidence may prove otherwise, at this stage, the Court finds such harm would indeed be undue. *Raimonde,* 325 N.E.2d at 544 (Ohio 1975).

---

[9] The Court emphasizes that this Order is preliminary. Upon further consideration, after discovery and in the context of the motion for a preliminary injunction, the Court may find it appropriate to revise the injunctive relief in favor of any party.

## IV.  CONCLUSION

For these reasons, Plaintiff's motion for a temporary restraining order (Doc. 4) is

**GRANTED** to the following, limited extent:

1. Defendant **Dugger shall immediately cease** soliciting, or accepting the business of, customers or former customers of TQL in violation of the Agreement.  Further, **Dugger and Defendant Traffic Tech shall immediately cease** to provide its services to United Pipe until further notice.

2. Dugger is enjoined from disclosing any trade secrets or confidential information.

3. Except that Dugger may for now continue his employment with Traffic Tech, Dugger **shall** abide by all terms of the Agreement with TQL.

4. Additionally, the parties **shall** confer and jointly submit a mutually agreeable calendar for expedited discovery and briefing on the motion for preliminary injunction to the Court via email to Chambers (black_chambers@ ohsd.uscourts.gov) within seven days of this Order.

5. Because this Order was issued on notice with full participation of all parties, and because the parties have requested discovery of unknown duration before briefing the preliminary injunction, absent an alternative agreement reached by the parties, this **Order will remain in place until the motion for preliminary injunction is resolved**. *See, e.g.*, *Church Mut. Ins. Co. v. Smith*, No. 3:14-CV-749-JHM, 2015 WL 3863164, at *3 (W.D. Ky. June 22, 2015).

6. Defendant's motion for leave to enter a sur-reply (Doc. 14) is **DENIED** as moot.

7. Because of the irreparable harm TQL faces, and as is within the Court's discretion, the Court does not now require a security bond.  *See Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1175–76 (6th Cir. 1995).  The Court may revisit the issue of a security bond in resolving the motion for a preliminary injunction.

**IT IS SO ORDERED**.

Date:  12/8/2021

Timothy S. Black
United States District Judge