**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No. 1:21-cv-714 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| TRAFFIC TECH, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER RESOLVING DISCOVERY DISPUTES**

This civil action is before the Court on several discovery disputes as presented to the Court at an informal discovery conference on January 18, 2022 and by the parties in letter statements to the Court.

**I. BACKGROUND**

Plaintiff Total Quality Logistics, LLC ("TQL") is an Ohio limited liability company with its principal place of business in Clermont County, Ohio. (Doc. 3 at ¶ 2). TQL provides third-party logistics services to customers across the continental United States. (*Id.*). Defendant Traffic Tech Inc. ("Traffic Tech") is an Illinois limited liability corporation with its principal place of business in Chicago, Illinois. (*Id.* at ¶3) and a competitor of TQL. (*Id.*).

Defendant Nickolas Dugger is a former employee of TQL. (*Id.* at ¶¶4). Dugger worked for TQL in Florida from January 6, 2020 to September 24, 2021 in the positions of Logistics Account Executive Trainee and Logistics Account Executive. (*Id.* at ¶¶ 4, 14).

Dugger signed TQL's "Confidentiality Agreement and Restrictive Covenant" (the "Agreement"). (Doc. 3-1). The Agreement contains this language:

> During employment with TQL, and for a period of one (1) year immediately following termination of Employee' employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, Employee shall not (directly or indirectly, either as an individual on Employee's own account or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise on another's account) contact, solicit or accept business from, render any services to, give assistance to, or accept any compensation from any Customer or customer prospect of TQL. A customer prospect is any business, company, individual, partnership, or entity, including former Customers, with which TQL or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of TQL within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.
>
> Further, Employee hereby agrees that Employee shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of TQL, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on Employee's own account, or as a partner, Joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise of another, for a period of one (1) year after the date of the termination of Employee's employment with TQL.

The Agreement prohibits Dugger from soliciting any TQL customers or motor carriers, taking action to divert business from TQL, interfering with or attempting to disrupt TQL's relationships, or soliciting TQL employees or former employees. (*Id.* at §9).

It is undisputed that Dugger left TQL and, within the same year, took a job with Traffic Tech. (*See* Declaration of Nickolas J. Dugger, "Dugger Declaration," Doc. 7-1, at ¶21). And it is also undisputed that United Pipe, Dugger's largest client at TQL, started working with Traffic Tech when Dugger moved there himself. (*Id.* at ¶17).

2

Dugger, in response to the instant lawsuit against him, alleges (*inter alia*) wrongful employment practices of TQL. Primarily, as is relevant to the current disputes, Dugger claims TQL wrongly classified him as exempt under the Fair Labor Standards Act ("FLSA"). (*Id.* at ¶13).

After discovering Dugger's employment with Traffic Tech, TQL filed its complaint and moved for a temporary restraining order ("TRO") and a preliminary injunction. (Doc. 4). The Court entered a limited TRO, restricting Dugger from working with United Pipe and other former customers he serviced at TQL on behalf of Traffic Tech, but not enjoining him from his employment with Traffic Tech generally. (Doc. 15). TQL also moved for the TRO on the basis of alleged trade secret misappropriation and tortious interference, but the Court did not find that TQL demonstrated a likelihood of success on those claims. (*Id.*).

The parties requested, and the Court approved, an expedited discovery and briefing schedule ahead of the Court's consideration of TQL's motion for a preliminary injunction. *See* Notation Order of December 16, 2021. The parties quickly became tied up in discovery disputes.

Broadly speaking, the discovery disputes concern Traffic Tech and Dugger's discovery requests of TQL. Traffic Tech has requested information related to TQL's clients, including a full list of clients, specific sales data, call notes, and TQL's communications with customers. Traffic Tech suggests that this information is relevant to the broadness and reasonableness of the Agreement and to the lack of irreparable harm

3

TQL alleges it will suffer from its alleged loss of customer goodwill. For his part, Dugger specifically seeks information related to TQL's alleged FLSA violations. Dugger asserts that this information is relevant to and necessary for his "unclean hands" defense to the injunctive relief requested by TQL.

At an informal discovery conference conducted by the Court on January 18, 2022, all parties expressed an unequivocal desire to maintain an expedited discovery and briefing schedule. Additionally, as supplements to letter statements submitted to the Court in advance of the discovery conference, the parties have supplied the Court with the interrogatories and requests for production ("RFPs") at issue. Because of the parties' expressed will to proceed quickly, and given the documents that the Court already has on hand, the Court has decided to resolve these discovery disputes now by written Order.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure grant courts broad discretion in determining the scope and method of discovery based upon the circumstances of each case. Fed. R. Civ. P. 26(b)(2). Specifically, Rule 26(b)(2) permits a court, upon its own initiative, to limit "the frequency or extent of use of discovery methods" if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

## III. ANALYSIS

Before turning to the substance of the discovery disputes, the Court makes a few points for context.

First, the parties have opted for a speedy discovery process and rejected the idea of conducting slower but more comprehensive discovery on the merits while the TRO remains in place. The Court respects that choice but will use its ample discretion to limit discovery as necessary to allow the parties to proceed expeditiously. That means the Court will especially scrutinize discovery requests that are overbroad, burdensome, or relatively unimportant. See Fed. R. Civ. P. 26(b)(2).

Second, because the parties want bifurcated and expedited discovery for purposes of the preliminary injunction motion, the Court will analyze the discovery at-issue for its tailoring to the questions before the Court on a motion for a preliminary injunction. As another court has persuasively put it: "when the potential purposes of discovery are circumscribed, the likely benefits of any particular discovery request are correspondingly limited." *Mulligan v. Provident Life & Acc. Ins. Co.*, 271 F.R.D. 584, 590 (E.D. Tenn. 2011). Accordingly, this Court "must determine not only whether a discovery request is relevant, but also whether the requested information will make a difference in its review—*i.e.*, the "likely benefit" of the evidence. *Id.*

To that end, the Court can confidently say that most of the discovery requests at-issue do not seek information that is wholly irrelevant to the merits. In many cases, though, they do seek information that is overbroad or that is unlikely to make a difference

5

in the Court's determination on the preliminary injunction motion. The Court now turns to the specific requests in dispute.

### A. The List of Customers Subject to the Injunction Motion
(Traffic Tech's Integratory No. 1 and RFP No. 9)

Traffic Tech requests a list of all TQL's customers that are off-limits to Dugger at Traffic Tech by virtue of the Agreement. Traffic Tech argues this information is relevant to the "reasonableness" of the Agreement.[1]

Because of the wide net cast by the Agreement, a responsive inquiry would equate to TQL producing a list of every single customer and customer prospect of TQL. The Court finds this request unnecessary for two reasons. First, in the Order granting the TRO, the Court already found that the Agreement "is overbroad in the abstract but reasonable and enforceable as applied to Dugger's solicitation, even passively, of TQL's clients." (Doc. 15 at 6). In other words, the Court agrees with Defendants that the Agreement as written is unreasonable in its breadth. There is therefore little need to determine *exactly how* overbroad the agreement is with reference to customer names. In resolving the preliminary injunction motion, the Court will focus its attention on the Agreement as applied to Dugger's and Traffic Tech's behavior—not on the agreement in isolation. Accordingly, the "likely benefits" of this particular discovery request, as written, are "limited." *Mulligan*, 271 F.R.D. at 590 (E.D. Tenn. 2011).

---

[1] The Court's representations of the parties' positions emanate from the parties' letter statements provided to the Court and are thus not part of the record.

Second, assuming the absolute breadth of the Agreement by its own terms may have limited value, it is still unnecessary to require TQL to produce a comprehensive list of its customers where other measures of the Agreement's scope are available.  The Court will thus require TQL to produce a good-faith aggregate figure for the total number of customers that come within the ambit of the Agreement's definition of "customer" and "customer prospect."

Traffic Tech makes another argument for obtaining the full list of customer names. It wants to ascertain exactly which potential customers are off-limits to Dugger's solicitations.  This is perhaps important for Dugger's continued job duties with Traffic Tech.  It is not substantially relevant to the questions the Court will consider on a preliminary injunction.[2]  Moreover, it does not appear that TQL is trying to enforce the Agreement such that Dugger could not contact a client that TQL has worked with but Dugger subsequently solicited based on wholly independent information he received after he left TQL. Thus, this justification for the discovery is not persuasive.

Accordingly, in lieu of responding to Traffic Tech's Interrogatory No. 1 and RFP No. 9, TQL shall provide to Traffic Tech a good-faith estimate of how many customers and prospective customers the Agreement would forbid Dugger from doing business with.

---

[2] It is very unlikely this Court will enforce the Agreement such that Dugger could not contact any customer who has ever done business with TQL where that client's relationship to TQL is unknown to Dugger.

7

### B. TQL's business with the at-issue customers
(Traffic Tech's Interrogatory Nos. 2, 6, 9; RFP Nos. 3-6)

In its letter statement to the Court, Traffic Tech writes:

Traffic Tech requested documents reflecting TQL's sales to Dugger's customers at TQL before, during, and after his employment, requested that TQL identify any confidentiality, nondisclosure,or exclusivity agreements it has with those customers, and requested that TQL identify TQL's date of first sale with those customers. TQL contends that Dugger's Agreement is designed, in part, to protect its customer goodwill; these discovery requests are designed to acquire information regarding that goodwill, and to assess whether Dugger's employment at Traffic Tech has caused irreparable harm to TQL's business.

Defendants contend these customers were not long-standing TQL customers—they worked with TQL because of Dugger.

Initially, the Court agrees that Traffic Tech should have some insight into TQL's claimed irreparable harm to their customer goodwill. It is, after all, a central consideration on a motion for a preliminary injunction. *See*, *e.g.*, *Overstreet v. Lexington-Fayette Urb. Cty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002).

Customer goodwill and its relationship to irreparable harm can be difficult to pin down. The Sixth Circuit has determined that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). On the other hand, courts have held "[w]hether or not the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Nexteer Auto. Corp. v. Korea Delphi Auto. Sys. Corp.*, No. 13-CV-15189, 2014 WL 562264, at *10 (E.D. Mich. Feb. 13, 2014).

8

Summarizing the above-cited authorities, the Court finds that while, in some cases, irreparable harm may be presumed from the loss of *any* customer goodwill, the scope of the loss of goodwill *is* nonetheless relevant to the irreparable harm inquiry. Accordingly, the Court finds it is appropriate to permit *some* discovery requests tailored to this purpose.

Again, though, the Court must consider the expedited schedule and balance, among other things, need, burden, and importance. Fed. R. Civ. P. 26(b)(2). Keeping those things in mind, the Court determines RFP Nos. 5 and 6 are substantively appropriate but subject to pruning. Specifically, RFP Nos. 5 and 6 request documents related to "sales made by TQL to any Customer that Dugger sold to while employed at TQL during his employment at TQL" and, ostensibly as a basis for comparison, "[d]ocuments which reflect or record any sales by TQL to any Customer that Dugger sold to while employed at TQL *after his employment at TQL ended*." Traffic Tech also asks for related "revenue and gross profit for each sale."

Aware of its limited familiarity with industry jargon, the Court orders the following: TQL must offer documents responsive to RFP Nos. 5 and 6 such that TQL produces a clear picture of sales, in dollar amounts, that TQL made to Dugger's customers during Dugger's employment, and the comparable sales made to those same customers after Dugger departed up until the date of this Order. TQL *does not* need to produce figures for profit. Furthermore, TQL may aggregate these sales figures on a

9

monthly basis if necessary to make a timely production.[3]

On the other hand, the Court finds Traffic Tech's RFP Nos. 3 and 4 are overbroad and burdensome relative to the information's importance to the case. Traffic Tech's RFP No. 3 is a request for all "call logs, internal notes and/or notes" from TQL's internal systems that relate to Dugger's clients. While perhaps appropriate in general discovery, this request is not tailored to the needs of a preliminary injunction briefing. The sales data is appropriately probative of any irreparable harm. A deep-dive into client communications would be cumulative and burdensome. The Court also suspects that this call log information is meant to show that Dugger built the relevant goodwill himself—a theory that this Court regards as a non-starter, as explained below.

Traffic Tech's RFP No. 4 requests documents for sales "to any customer that Dugger sold to while employed at TQL *prior to Dugger's employment at TQL*." This request is based on Plaintiff's theory that Dugger's customers at TQL were only ever customers of TQL because of Dugger. Thus, according to Defendants, those customers had no goodwill for TQL in its own name. As the Court found in its TRO, this theory has no basis in law. (Doc. 15 at 16-17). Even if Dugger's skill was singularly responsible for luring his clients to TQL, Duggar reached out to them as an agent of TQL. Dugger cannot

---

[3] Traffic Tech's letter mentions "monthly load amounts" as an indicator of business activity and also states that amount is perhaps easily accessible through a customer relationship management software. The Court is not entirely clear what the term means. But if the parties agree that "monthly load amounts" accurately reflect Dugger-initiated business activity at TQL during his employment and comparable sales afterward, the parties are free to use "monthly load amounts" as the indicator.

simply lay claim to the goodwill.

Accordingly, for reasons stated above, in responding to RFP Nos. 5 and 6, TQL need only produce documents showing TQL's sales to Dugger's customers at TQL *during* and *after* Dugger's employment with TQL. TQL need not reveal profit figures and may aggregate data, as necessary. TQL does not need to respond to Traffic Tech's RFP Nos. 3 and 4. The interrogatories largely track the RFPs. Accordingly, the Court orders that TQL shall respond to Traffic Tech's interrogatory No. 2 with the sales data described above. TQL does not need to respond to Traffic Tech's interrogatories No. 6 and No. 9.

**B. TQL's communications with and about the at-issue customers**
(Traffic Tech's RFP Nos. 7 and 8).

Traffic Tech seeks "TQL's communications with and about Dugger's customers" because they "have a direct bearing on TQL's claimed interest in enforcement of the contract and alleged irreparable harm." Counsel for Traffic Tech further explains that "TQL's attempts (or lack thereof) to transition Dugger's customers to other brokers bears on whether the length of the restrictive covenants should be reduced." Finally, TQL argues these communications will shed light on "TQL's efforts to retain Dugger's customers" which in turn reflect "the legitimacy of TQL's claimed harm and legitimate business interest."

The Court finds producing so much correspondence on an expedited timetable would constitute an extraordinary burden. And the information is likely of minimal value

to the Court or the parties on a motion for a preliminary injunction. The reasonableness of the Agreement's duration is unlikely to depend on TQL's behavior after Dugger's departure. Furthermore, as the Court has already held, "the one-year duration is 'facially reasonable.'" (Doc. 15 at 6 (citing *Ak Steel Corp., v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *15 (S.D. Ohio Apr. 17, 2014)). Given this facial reasonableness, the Court is not inclined to permit document discovery into the issue of duration unless there is some other indication the one-year length of the Agreement is unwarranted.

Traffic Tech also fails to make a convincing argument for its alternative justification that these communications are probative of "TQL's legitimate business interest" and "claimed harm." The Court notes that Defendants' proffer of relevance here is itself muddled and without legal authority in support. But, more importantly, there are other measures of harm and legitimate business interests available to Traffic Tech. The request is excessive to the needs of the relevant questions on a preliminary injunction motion.

Accordingly, TQL does not need to respond to Traffic Tech's RFP Nos. 7 and 8.

**C. Dugger's unclean hands defense defense to the injunction based on violations of the FLSA**
   (Dugger's Interrogatory Nos. 1, 2, 5, 6, 8, 9 and 10; and
    RFP Nos. 1, 2, 7, 8, 9 and 10)

Dugger has sought information in discovery from TQL about potential FLSA violations. Dugger generally maintains that TQL misclassified him and therefore underpaid him in violation of the FLSA, especially with respect to his work in TQL's

12

"extensive training program." Dugger further argues that TQL's alleged employment wrongs, including possible FLSA violations, provide Dugger with an "unclean hands" defense to the injunctive relief TQL seeks. The Court has already held that an unclean hands defense is available as a defense to a preliminary injunction sought under Federal Rule of Civil Procedure 65, even if otherwise applicable state law would not permit a defendant to raise such a defense. (*See* Doc. 15 at 22 (citing *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)). The question is whether the Court should permit discovery into the issue, and if so, how much.

"The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers*, Inc., 52 F.3d 1373, 1383 (6th Cir. 1995). Courts in the Sixth Circuit have narrowly construed the "related to" language on the unclean hands standard, such that "the conduct alleged to bar the action must relate to the controversy in issue and must have an immediate and necessary relation to the equity that is asserted in the lawsuit." *Pierce v. Apple Valley, Inc.*, 597 F. Supp. 1480, 1485 (S.D. Ohio 1984) (internal citations and quotations omitted). Moreover, to act as a bar to equitable relief, the "unconscionable act" must be "directed at defendant." *Id.*

TQL makes three arguments against discovery into its potential unclean hands.

First, TQL argues that any FLSA violations are not related to enforcement of the non-compete Agreement. TQL may yet prove itself correct on this point. But TQL is

13

here making an argument on the merits of the unclean hands defense rather than on the appropriateness of discovery into that same defense. As a court weighing a similar question held: "arguments directed to the merits of the plaintiff's claims or the viability of affirmative defenses should be addressed by way of dispositive motion or at trial and not during a discovery dispute." *S. Pointe Wholesale, Inc. v. Vilardi*, No. 1:17-CV-00052-GNS, 2018 WL 1721936, at *3 (W.D. Ky. Apr. 9, 2018) (cleaned up).[4] Accordingly, TQL's argument is premature.

Moreover, Dugger points out that TQL's extensive training of Dugger is recited by TQL as motivation for the injunctive relief *and* that the same extensive training is also at the heart of the unconscionable treatment alleged by Dugger. This argument may or may not ultimately prevail. Regardless, discovery into the unclean hands defense is relevant because the unclean hands defense is relevant to the questions before the Court on the preliminary injunction motion. As with the plaintiff in *S. Point Wholesale*, TQL "has not demonstrated that the information is not relevant to the unclean hands defense." 2018 WL 1721936, at *4 (W.D. Ky. Apr. 9, 2018).

Second, TQL argues FLSA claims are subject to arbitration by agreement between the parties. As Dugger points out, Dugger's FLSA argument is a "defense" to the injunctive relief TQL seeks. It would be very strange indeed if TQL could seek an injunction under this Court's equity powers and then remove an otherwise applicable

---

[4] For the present case, of course, TQL may direct its arguments regarding the shortcomings of Dugger's unclean hands defense to the preliminary injunction.

14

defense to that injunctive relief on the basis of an arbitration agreement. Notably, TQL cites no law in support. Furthermore, the Court is not willing to accept TQL's likewise unsupported assertion that this Court's decision on the unclean hands defense would render the FLSA issues between the parties "res judicata." Accordingly, TQL's argument here is not well-taken.

The Court finds that a few of Dugger's interrogatories and RFPs are overbroad or unimportant relative to the needs of the case. Accordingly, the Court will limit Dugger's discovery requests, per below. The Court first analyzes Dugger's interrogatories.

Dugger's interrogatory Nos. 1 and 2 relate directly to the terms of Dugger's employment at TQL—specifically his compensation and his hours—and therefore his affirmative defense. For that reason, TQL shall respond to those interrogatories as written. Dugger's interrogatory No. 10 is similarly well-tailored and relevant. TQL shall respond to Dugger's interrogatory No. 10, as written.

Dugger's interrogatory No. 5 is overbroad. It requests information about complaints from similarly positioned TQL employees going all the way back to 2010. Because the unclean hands defense must assert conduct related to a bad act directed toward the "defendant," the Court will limit the request in scope. *Pierce*, 597 F. Supp. at 1485 (S.D. Ohio 1984). Thus, TQL shall provide the information requested in Dugger's interrogatory No. 5 but only for the time-period of Dugger's employment at TQL. For similar reasons, TQL shall respond to Dugger's interrogatory No. 6—requesting information about Department of Labor investigations—but only needs to produce

15

information from the time-period of Dugger's employment at TQL. Finally, TQL shall respond to interrogatory No. 9 but only needs to provide information for the personnel in charge of FLSA compliance during Dugger's employment with TQL.

Interrogatory No. 8 is a curiosity. It asks for information related to anyone who has audited TQL's relevant employees or conducted a "time analysis." It is squarely relevant. However, it seems it could be protected by a claim of privilege. For now, the Court will require TQL to respond to it—substantively or with a claim of privilege, as is its right.

Applying similar reasoning to Dugger's contested RFPs ,as it did to Dugger's contested interrogatories, the Court finds as follows: TQL shall respond to Dugger's RFP Nos. 1, 2 and 7 without modification.

Dugger's RFP No. 8 is relevant and tailored but is slightly confusing in what it seeks. To resolve all doubt, the Court clarifies that TQL shall respond to Dugger's RFP No. 8 but may do so by providing *only* those communications sent *to* Dugger *by* TQL.

Dugger's RFPs Nos. 9 and 10 are overboard because, like several of Dugger's interrogatories, it is not oriented to the timeframe of Dugger's employment with TQL. Thus, the Court orders that TQL shall respond to Dugger's RFP No. 9 and 10 but may do so by providing the relevant information, subject to any claims of privilege, only for the period of Dugger's employment with TQL.

The Court makes a few points in conclusion. First, the Court has not significantly engaged with TQL's standing objection that Defendants seek an "avalanche of sensitive

information."  A generalized concern about "sensitive information" is not a proper objection to discovery requests writ-large.  The Court further notes the parties have a protective order in place. (Doc. 20).  The protective order would seem to address these vary concerns.

Second, the Court is cognizant that this Order may upset prior arrangements reached by the parties through negotiation. The parties may raise such issues in the status report it shall provide to the Court, per below.

## IV.  CONCLUSION

For the reasons stated herein, the Court finds that:

1. TQL shall respond immediately to Dugger's and Traffic Tech's discovery requests as directed above.

2. Per this Court's Notation Order of January 18, 2022, "[b]y 01/25/2022, the parties SHALL confer and jointly submit via email (black_chambers@ ohsd.uscourts.gov) new proposed dates for briefing on the preliminary injunction and highlight any further discovery disputes that both: i) were not addressed by [this] discovery order; and ii) could not be resolved after a meet-and-confer."

   **IT IS SO ORDERED.**

Date:   ___1/21/2022_____                        ___*s/Timothy S. Black*_____
                                                     Timothy S. Black
                                                     United States District Judge