IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **TOTAL QUALITY LOGISTICS, LLC,** | : | |
| **Plaintiff,** | : | Case No.: 1:21-cv-00714 |
| v. | : | Judge Timothy Black |
| **Traffic Tech, Inc., et al.** | : | |
| **Defendants.** | | |

### TOTAL QUALITY LOGISTICS, LLC'S MOTION TO COMPEL ARBITRATION OF AND FOR STAY REGARDING WHETHER TQL COMMITTED IMPROPER PAY PRACTICES AGAINST DEFENDANT NICKOLAS DUGGER

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, Plaintiff Total Quality Logistics, LLC ("TQL") respectfully moves this Court to compel Defendant Nickolas Dugger ("Dugger") to arbitrate the issue of whether TQL has engaged in improper pay practices toward him, pursuant to an enforceable arbitration agreement entered into by Dugger and TQL, and to issue a stay of litigation of that issue during the pendency of this motion and the pendency of arbitration. The reasons for this Motion are more fully set forth in the attached Memorandum in Support.

Respectfully Submitted,

*/s/ Matthew J. Wiles*
Matthew J. Wiles (0075455)
Kelli J. Amador (0095550)
Dinsmore & Shohl LLP
191 W. Nationwide Blvd.
Suite 300
Columbus, Ohio 43215
Matthew.wiles@dinsmore.com

***Attorneys for Plaintiff Total Quality Logistics, LLC***

## MEMORANDUM IN SUPPORT

**I.  INTRODUCTION**

Dugger has asserted in this case that TQL engaged in improper pay practices toward him, including violating the FLSA, while he was employed at TQL. Prior to commencing employment with TQL, however, Dugger and TQL entered into a Dispute Resolution and Arbitration Agreement ("Agreement"),[1] in which Dugger agreed to resolve outside of litigation "any and all of the Parties' rights, causes of action, or claims against or between one another that arise out or relate in any way to [Dugger's] employment with [TQL], unless otherwise excluded in this Agreement."[2] TQL's alleged improper pay practices fall squarely within this definition, and the Agreement does not otherwise exclude such practices from its scope.[3]

That Dugger claims the assertion forms the basis of an affirmative defense to the equitable relief TQL seeks in this case is of no moment. The Sixth Circuit has made clear that parties to an arbitration agreement are presumed to know the scope and content of the agreement. The only grounds on which the Court may decline to compel him to arbitrate the assertion is if Dugger can prove that there are grounds to *revoke* the Agreement—not just that he thinks it would be unfair to require him to arbitrate the improper pay practices issue.

Accordingly, whether the assertion is treated as a claim or defense is immaterial both legally and according to the language of the agreement—Dugger must be compelled to arbitrate it and TQL respectfully requests that the Court order the same.

---

[1] A copy of the Agreement is attached as Exhibit A to the Affidavit of Marc Bostwick, filed contemporaneously herewith. Bostwick Aff. ¶ 2 & Ex. A.
[2] *Id.*, Ex. A §§ 1(A)-(B) (defining "Legal Claims"), 2 (outlining dispute resolution process).
[3] *Id.*, Ex. A §§ 1(A)-(B) (defining "Legal Claims").

## II. BACKGROUND

### A. The Agreement

Dugger is a former TQL freight broker who left the company to work as a freight broker for Defendant Traffic Tech, Inc. ("Traffic Tech"), a TQL competitor. *Verified Complaint* ¶¶ 3-4, ECF No. 3, PageID 19. Prior to commencing employment with TQL, Dugger and TQL entered into a Dispute Resolution and Arbitration Agreement ("the Agreement"). Bostwick Aff. ¶ 2 & Ex. A.

The Agreement provides that "[t]he Parties agree to resolve any and all disputes and claims between them ('Legal Claims') in accordance with the terms of this Agreement exclusively." *Id.* ¶1. The Agreement sets forth a definition of "Legal Claims": "any and all of the Parties' rights, causes of action, or claims against or between one another that arise out or relate in any way to [Dugger's] employment with [TQL], unless otherwise excluded in this Agreement." *Id.* §1, A.

The Agreement lists a host of "rights, causes of action, or claims" that are excluded from the definition and a host of the same that are specifically included in the definition. Among the former are "claims for . . . injunctive relief, or any other causes of action relating in any way to the Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement between [Dugger] and [TQL]." *Id.* §1, B. Among the latter are "any and all claims for wages, salary, bonuses, commission, overtime pay, premium pay, vacation pay, severance pay, benefits, contributions, or any other claims for compensation, including, without limitation, claims under the [FLSA] or any applicable state or local law comparable to the FLSA[.]" *Id.* §1, A. Dugger's "rights, causes of action, or claims" related to alleged improper pay practices are, obviously, not excluded in the Agreement.

"Legal Claims" that were not excluded, Dugger and TQL agreed, would be resolved through a two-step dispute resolution process, including arbitration. The Agreement further provided that Dugger, "BY SIGNING THIS AGREEMENT, UNDERSTANDS THAT THIS IS A CONTRACT TO USE ARBITRATION INSTEAD OF A JUDGE OR JURY TO RESOLVE ANY AND ALL CLAIMS AND DISPUTES BETWEEN [him] AND [TQL]." *Id.* § 13.

### B.  TQL Files a Lawsuit Alleging Non-Arbitrable Claims

TQL instituted this action for injunctive relief and damages for Dugger's violation of his Non-Compete, Confidentiality, and Non-Solicitation Agreement, which was a separate contract that he signed prior to commencing employment with TQL. There is no dispute that Dugger left TQL to go work for a competitor, and there is no dispute that Dugger has been in contact with and done business on behalf of Traffic Tech with customers that he serviced while in the same position at TQL. Whether he violated the language of his restrictive covenant, therefore, is not a close call.

### C.  Dugger Asserts as a Defense That TQL Engaged in Improper Pay Practices

Dugger asserts, however, that TQL is not entitled to preliminary injunctive relief because TQL's improper pay practices directed toward him, including most prominently an alleged misclassification in violation of the FLSA, render its hands "unclean." *Dugger's Opposition to TQL's Motion for TRO*, ECF No. 7, PageID 173. In its reply brief in support of the injunctive relief, TQL pointed out, *inter alia*, that under Sixth Circuit precedent, such alleged improper pay practices while Dugger was at TQL could not form the basis of an unclean hands defense because they had no "direct" and "immediate and necessary" relation to Dugger's conduct after leaving TQL, which formed the basis of the request for injunctive relief. *TQL's Reply in Support of Motion for TRO,* ECF No. 13, PageID 246.

4

### D. The Court Enters a Limited TRO

On December 8, 2021 the Court entered a limited temporary restraining order, permitting Dugger to continue working at Traffic Tech but foreclosing him from doing business with any of the customers he serviced while at TQL and forbidding Traffic Tech from accepting any additional business from one of those customers in particular. With the exception of that one specific customer, the order did not prohibit Dugger from handing off to another broker at Traffic Tech the business he had brought in from any other customers he serviced while at TQL.

In the decision, the Court stated that the unclean hands defense was theoretically available to Dugger, but that he had not proven it sufficient to defeat TQL's request for temporary injunctive relief. The Court did not specifically address TQL's contention that the alleged improper pay practices were not sufficiently related to the conduct for which TQL sought relief and therefore could not serve as a basis for invocation of the unclean hands defense.

### E. The Parties Meet and Confer Regarding Discovery Disputes, Including Whether the Improper Pay Practices Issue Must be Submitted to Arbitration

Shortly after entry of the temporary injunctive order, the parties met and conferred to discuss the expedited discovery that would need to occur before the Court could determine whether TQL was entitled to preliminary injunctive relief. *See Wiles Aff.* ¶2, contemporaneously filed herewith. During that call, counsel for TQL noted to counsel for Dugger that the issue of whether TQL engaged in improper pay practices was an issue that had to be arbitrated under the Agreement and provided a copy of the Agreement as well. *Id.*

Thereafter, on December 21, 2021 the parties served expedited discovery requests. The majority of Dugger's requests were aimed at TQL's alleged improper pay practices, focusing most specifically on whether TQL properly classified Dugger as an exempt employee. On December 24, 2021 TQL served objections to these requests, noting first that the Court had not addressed

5

whether such alleged pay practices had a "direct" and "immediate and necessary" relation to Dugger's post-TQL conduct and, second, that the issue had to be arbitrated under the Agreement anyway. Wiles Aff., ¶3, & Ex A.

In response, Dugger maintained that the Court had provided him *carte blanche* to explore in expedited discovery whether TQL had engaged in improper pay practices, that such practices were related to Dugger's conduct because they existed at the same time that Dugger went through training at TQL, and that Dugger did not have to arbitrate the issue because it was "related" to his restrictive covenant. Wiles Aff. ¶4, & Ex. B., p. 2. Dugger admitted, however, that he intends to file an affirmative counterclaim on the basis of the alleged improper pay practices. Wiles Aff., Ex. B, p. 2, n.1.

### F.  **The Court Orders Discovery to Proceed on the Improper Pay Practices Act, Leaving TQL No Option But to File the Instant Formal Motion**

With the parties unable to resolve their discovery dispute, the Court ordered that an informal discovery conference occur and that the parties submit short statements summarizing the issues in dispute. *January 7, 2022 Notation Order*. In its statement, TQL noted that the Court had not addressed whether the alleged improper pay practices that occurred while Dugger was employed had a "direct" and "immediate and necessary relation" to him working for Traffic Tech and soliciting his old TQL customers for business. Wiles Aff. ¶5 & Ex C. TQL also noted that, in any event, whether TQL engaged in improper pay practices was an issue that fell squarely within the scope of the Arbitration Agreement. *Id.*

Following the informal discovery conference, the Court issued an order on the discovery disputes. *Order Resolving Discovery Disputes,* ECF No. 21. In the Order, the Court stated that TQL may well be correct that there was not sufficient relation between the alleged pay practices

6

and Dugger's conduct on behalf of Traffic Tech, but that Dugger was entitled to discovery on the issue nonetheless.[4] *Id.,* p. 13.

The Court addressed the argument that the alleged pay practices issue had to be arbitrated only briefly. Specifically, the Court stated that TQL's position would mean that Dugger would be precluded from litigating in court a defense to a claim asserted in court and that TQL had failed to provide any authority supporting that result.[5] *Id.*, p. 14. The Court ordered TQL to provide certain discovery related to the alleged improper pay practices. *Id.*

Doing so, however, would have required TQL to finally act in a manner inconsistent with its belief that the dispute had to be arbitrated. Thus, TQL had no option but to bring this formal motion to preserve its rights. Because the improper pay practices issue constitutes a "Legal Claim" under the language of the Agreement, TQL respectfully submits that Dugger must be compelled to arbitrate it.

### III. ARGUMENT

#### A. Legal Standard on a Motion to Compel Arbitration

There is a "strong federal policy in favor of enforcing arbitration agreements." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). Courts are to "rigorously enforce" such agreements, *see Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987), and any doubts over the scope of arbitrable issues should be resolved in favor of arbitration, s*ee Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Glazer v. Lehman Bros.*, 394 F.3d 444,

---

[4] TQL respectfully notes that the Court appears to have misconstrued TQL's argument on this point. Whether TQL engaged in improper pay practices is beside the point. TQL's argument was that even if that did occur, there is not a direct and immediate and necessary relation between it and Dugger's conduct on behalf of Traffic Tech. Nothing in discovery, no matter what it revealed, would change that.

[5] To be fair, TQL did not treat the 1-3 page statement of the discovery dispute as a full legal brief. As this motion shows, there would not have been sufficient space to fully address the arbitrability issue, much less that plus the multiple other issues that were in dispute.

451 (6th Cir. 2005). In line with this, the Federal Arbitration Act provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity *for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added).

Thus, the Court's role when faced with a motion to compel arbitration has been described by the Sixth Circuit as "a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). When making this determination, the Court should not deny a motion to compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *U.S.W. v. Mead Corp.*, 21 F.3d 128, 131 (6 th Cir. 1994) (internal quotation marks and citation omitted). "Moreover, in cases involving broad arbitration clauses"—like the one here—"the [Supreme] Court has found the presumption of arbitrability 'particularly applicable,' and only an express provision excluding a particular grievance from arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Id.* (quoting *AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 648-51, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986)).

Here, the Agreement is valid,[6] and there is no doubt "the specific dispute" of TQL's alleged improper pay practices falls within its scope.

### 1. The Improper Pay Practices Assertion Falls Within the Scope of the Agreement

Even Dugger does not dispute that, if he had asserted the allegedly improper pay practices as an affirmative "claim," it would certainly fall within the scope of the Agreement and would

---

[6] Dugger has never contended that he did not sign the arbitration agreement or that it is otherwise invalid for any reason. He merely contends that the improper pay practices issue does not need to be arbitrated.

8

have to be arbitrated. TQL notes that there is indeed support, both from Dugger and the law, that the assertion actually is a claim or, at least, not a defense. Dugger himself has stated his intention to pursue the improper pay practices as an affirmative counterclaim.

And the authority he has cited in support of the proposition that it is an appropriate affirmative defense stand for no such thing. All of them stand instead for the non-controversial proposition that a defendant faced with a claim for injunctive relief based on contractual violations is permitted to assert as a "defense" that the party seeking such relief *violated the same contract*, *see SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 585 (Tex. Civ. App. 1966); *Chapman Air Conditioning, Inc. v. Franks*, 732 S.W.2d 737, 740 (Tex. App. 1987); *Schedler v. Fieldturf United States, Inc.*, No. 3:16-cv-344-JR, 2019 U.S. Dist. LEXIS 149575 (D. Or. Mar. 6, 2019), or that performance of the contract upon which injunctive relief is sought necessarily required the defendant to engage in unethical behavior, *see N. Pacific Lumber Co. v. Oliver*, 286 Or. 639, 662-63 (Or. 1979) (refusing to grant injunctive relief to an employer seeking to enforce a restrictive covenant because the former employee's performance of the contract required him to participate in improper claim settlement practices).[7] TQL has not been able to locate any authority that would support the notion that the assertion is an appropriate "defense" in the circumstances present here—where the misconduct asserted does not arise out of the same contract upon which the equitable relief is sought, and where Dugger's performance of that contract did not require him to engage in unethical activities. And, of course, none of these cases involved an arbitration agreement.

---

[7] These cases were cited in Dugger's opposition to the motion for injunctive relief. Dugger's Memo in opposition to Motion for TRO, p. 6, PageID 172-173

Regardless, Dugger's attention to the label he has slapped on the assertion of alleged improper pay practices misses the point.[8] All that matters, for purposes of determining whether he must arbitrate, is whether the issue falls within the scope of the contractual language. And there is no doubt that, here, it does. The Agreement provides that, unless otherwise specifically excluded, all "*rights*, causes of action, *or* claims" that "arise out of or relate in any way to [his] employment with TQL" must be arbitrated. Alleged improper pay practices are not excluded in the Agreement. They are, however, specifically listed as an example of what is included. Thus, unless he can demonstrate grounds for "revocation" of the Agreement, it must be enforced and Dugger must be compelled to arbitrate.

### 2. Compelling Dugger to Arbitrate an Alleged Defense to a Claim is Permissible and Enforceable

Dugger complains that this would force him to arbitrate a defense to a claim that TQL is permitted to litigate. Indeed, the Court, in its brief discussion, echoed the same concern. The concern, however, is not warranted. Simply put, there is no support in the law for the notion that such perceived unfairness is a ground upon which a motion to compel arbitration may be denied.

Neither a 1976 opinion from the 10th Circuit, *Reid Burton Constr., Inc. v. Carpenters Dist. Council of S. Colo.*, 535 F.2d 598 (10th Cir. 1976), nor a more recent 6th Circuit decision, *Int'l Union v. Cummins, Inc.*, 434 F.3d 478 (6th Cir. 2006)—the only authority to which Dugger has previously directed attention—do anything to change this. TQL can only conclude that Dugger's description of this authority was either mistaken or offered in the hopes that the Court would not actually read the decisions.

---

[8] The FAA itself supports this point. *See* 9 U.S.C. § 3 (referring to "*issue* referable to arbitration," not "*claim* referable to arbitration") (emphasis added).

Dugger claims that an equitable defense offered in litigation "cannot be impacted by contract," citing *Reid Burton* for the proposition "that an agreement to arbitrate 'equitable defenses arising out of actions by a party in proceedings before a district court . . . would not be enforceable' because 'it would be improper for the prospective parties of a lawsuit to attempt by contract to bind the exercise of a court's inherent judicial function.'" What Dugger fails to mention is that the relevant question being addressed in *Reid Burton* was whether the court was permitted to consider an equitable defense *to arbitrability*—not to a claim for injunctive relief—or whether such a defense would have to be resolved by the arbitrator. *Reid Burton*, 535 F.2d at 599 ("Two clearly drawn but different issues are involved in this appeal: . . . (2) whether the unions, because of certain pleading and procedural tactics employed by them in the district court, were prevented by the equitable doctrines of waiver, estoppel, repudiation, or laches from asserting the *arbitrability* of Burton Construction's complaint") (emphasis added).

Dugger's citation to *Cummins* suffers from the same flaw. Dugger cites the case to support the proposition that TQL cannot "pursue equitable relief in court," while at the same time barring Dugger "from advancing his equitable defenses to that relief in Court." The Sixth Circuit, however, was not considering whether a party was foreclosed "from advancing his equitable defenses *to that relief* in Court" at all, but, rather, like *Reid Burton*, was considering whether laches applied on the issue of arbitrability itself. *Cummins*, 434 F.3d at 486-87. Thus, Dugger has not offered the Court any authority that would permit it to set aside the language of the Agreement and conclude that he is not required to arbitrate the improper pay practices issue.

And he is incorrect that there is no legal support for the opposite proposition, that he is required to arbitrate it. As an initial matter, TQL notes that it is perfectly permissible for Dugger to contract not to assert an affirmative defense in litigation. *See HCRI TRS Acquirer, LLC v. Iwer*,

11

708 F. Supp. 2d 687, 693 (N.D. Ohio 2010) (holding the plain and ordinary meaning of contract language indicated that Defendants waived any equitable estoppel affirmative defense and related suretyship defenses); *Reed v. Bove*, No. 2:17-cv-168, 2019 U.S. Dist. LEXIS 135431, at *12 (S.D. Ohio Aug. 12, 2019) (applying Ohio law, a party may waive an affirmative defense by contract). Here, the Agreement does not state that Dugger is not allowed to seek a determination that TQL engaged in improper pay practices; it simply says he must do so through arbitration. It's a waiver of the right to seek *judicial* relief on the issue, not relief at all.

More to the point, however, the authority supporting the position that Dugger must arbitrate the improper pay practices issue is the language of the contract itself. Harsh as he may view it, the language of the Agreement is clear that TQL is permitted to seek injunctive relief in court for violations of Dugger's restrictive covenant, and that Dugger is foreclosed from raising outside of arbitration alleged improper pay practices. As the Sixth Circuit has instructed, Dugger "'is generally chargeable with knowledge of the existence and scope of an arbitration clause within a document signed by that party, in the absence of fraud, deception, or other misconduct that would excuse the lack of such knowledge.'" *See Haskins v. Prudential Ins. Co. of Am.*, 230 F.3d 231, 239 (6th Cir. 2000) (quoting and then adopting *Beauchamp v. Great West Life Assur. Co.*, 918 F. Supp.2d 1091, 1096 (E.D. Mich. 1996)). This is consistent with the FAA's mandate that such language must be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Dugger has never contended that TQL engaged in fraud, deception, or other misconduct in relation to the formation of the Agreement, that would allow him to revoke it now in litigation. Accordingly, TQL respectfully requests that the Court compel Dugger to arbitrate the issue of whether TQL engaged in improper pay practices, in accordance with the terms of the Agreement.

### 3. Permitting Dugger to Escape Arbitration by Claiming He is Offering an Affirmative Defense Would Render the Agreement Meaningless

TQL would be remiss if it did not also mention the practical effect Dugger's position would have, if accepted, on arbitration agreements. His contention is that he is permitted to evade the Agreement because whether TQL engaged in improper pay practices while he was at TQL is sufficiently related to the conduct in which he has engaged after leaving TQL. His most prominent point in making this connection is that the training program through which he was put while at TQL forms part of the basis in which TQL seeks to enjoin him from competing on behalf of Traffic Tech. The training program, however, is relevant to the injunctive relief only for its content, and TQL's alleged improper pay practices has nothing to do with that; everyone goes through the same training. At best, the only connection is that the alleged improper pay practices supposedly existed at the same time that Dugger was going through training.

But so too could a multitude of "Legal Claims" in the Agreement, which by definition are limited to the time of his employment. Thus, under Dugger's rationale he could assert an otherwise clearly arbitrable "defense" to TQL's clearly non-arbitrable claims that consisted of *any* alleged misconduct that occurred while he happened to be going through the training program. Assertions of discrimination, alleged violations of the Family Medical Leave Act, a contention that TQL intentionally used light bulbs that were too bright or served food that was not healthy—according to Dugger's theory, any and all of these kinds of accusations could be used to essentially void the Agreement so long as he simply claims the misconduct occurred when he was going through training and asserts it as a defense. In essence, he is urging the Court to insert an exception to the definition of "Legal Claims," something the Court is not permitted to do. This would clearly fly in the face of the federal policy favoring arbitration, much less the standards for compelling it, and would provide parties an easy path for evading the obligation to arbitrate.

### B. A Stay Should be Issued Only as to the Improper Pay Practices Issue

It is clear that any activity in this case concerning the improper pay practices issue should be stayed both pending resolution of this motion, *see Turner v. Monarch Inv. & Mgmt. Grp., LLC*, No. 2:20-cv-3997, 2021 U.S. Dist. LEXIS 27736, at *5-7 (S.D. Ohio Feb. 12, 2021), and pending arbitration of that same isuue, *see* 9 U.S.C. § 3, and TQL respectfully requests the same. TQL submits, however, that it is not necessary to stay the remainder of this action, which consists of TQL's non-arbitrable claims, because the non-arbitrable components are separate and distinct from the improper pay practices issue. *See e.g.*, *Yamasaki Korea Architects, Inc. v. Yamasaki Assocs.*, Case No. 08-10342, 2008 U.S. Dist. LEXIS 95261, at *12 (E.D. Mich. Nov. 17, 2008).

As noted above, Dugger contractually agreed that he would not litigate the issue of TQL's alleged improper pay practices, regardless of the label he gives it. Thus, that issue by definition has no impact, or role to play, on the remaining non-arbitrable issues in the case and is, accordingly, legally distinct.

It is also factually distinct. Whether TQL engaged in an improper pay practice toward Dugger is not an issue that will be touched upon when the parties engage in discovery over whether his post-TQL conduct violated his contractual or statutory obligations. This is true even to the extent such discovery covers the training program through which Dugger matriculated, in which the focus for purposes of the non-arbitrable claims concerns the content of it, regardless of how Dugger was paid or not paid.

Accordingly, TQL respectfully requests that the Court stay litigation of the improper pay practices issue during the pendency of this motion and the pendency of arbitration, and that it permit the remaining non-arbitrable issues to proceed.

## IV. CONCLUSION

For the foregoing reasons, TQL respectfully requests that the Court compel arbitration of the alleged improper pay practices issue, stay litigation of that issue during the pendency of this motion and during the pendency of arbitration, and allow the non-arbitrable issues in this case to proceed.

Respectfully Submitted,

*/s/ Matthew J. Wiles*
Matthew J. Wiles (0075455)
Kelli J. Amador (0095550)
Dinsmore & Shohl LLP
191 W. Nationwide Blvd.
Suite 300
Columbus, Ohio 43215
Matthew.wiles@dinsmore.com

***Attorneys for Plaintiff Total Quality Logistics, LLC***

,

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2022, the foregoing was filed using the Court's electronic filing system and a copy of the same was sent to all parties to this action.

*/s/ Matthew J. Wiles*
Matthew J. Wiles (0075455)

15